**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN DOE; JACK ROE; CALIFORNIA
REFORM SEX OFFENDER LAWS, on
behalf of themselves and others
similarly situated,
　　　　　　　*Plaintiffs-Appellees*,

　　　　　　v.

KAMALA D. HARRIS, Attorney
General of the State of California,
　　　　　　　*Defendant-Appellant*,

　　　　　　and

DAPHNE PHUNG; CHRIS KELLY,
　　　　　　*Intervenors-Appellants*.

No. 13-15263

D.C. No.
3:12-cv-05713-
TEH

JOHN DOE; JACK ROE; CALIFORNIA
REFORM SEX OFFENDER LAWS, on
behalf of themselves and others
similarly situated,
　　　　　　　*Plaintiffs-Appellees*,

　　　　　　v.

No. 13-15267

D.C. No.
3:12-cv-05713-
TEH

OPINION

KAMALA D. HARRIS, Attorney
General of the State of California,
              *Defendant-Appellant*,

and

DAPHNE PHUNG; CHRIS KELLY,
              *Intervenors-Appellants*,

Appeal from the United States District Court
for the Northern District of California
Thelton E. Henderson, Senior District Judge, Presiding

Argued and Submitted
September 10, 2013—San Francisco, California

Filed November 18, 2014

Before: Mary M. Schroeder and Jay S. Bybee, Circuit
Judges, and Robert J. Timlin, Senior District Judge.[*]

Opinion by Judge Bybee

---

[*] The Honorable Robert J. Timlin, Senior District Judge for the U.S.
District Court for the Central District of California, sitting by designation.

# SUMMARY[**]

## Civil Rights

The panel affirmed the district court's order preliminarily enjoining provisions of the Californians Against Sexual Exploitation Act, which seeks, among other things, to supplement and modernize reporting obligations for registered sex offenders by requiring offenders to provide "[a] list of any and all Internet identifiers established or used by the person" and "[a] list of any and all Internet service providers used by the person." Cal. Penal Code § 290.015(a)(4)–(5).

The panel first agreed with the district court that registered sex offenders who have completed their terms of probation and parole enjoy the full protection of the First Amendment. The panel then held that because the Act imposes a substantial burden on sex offenders' ability to engage in legitimate online speech, and to do so anonymously, First Amendment scrutiny was warranted. Applying intermediate scrutiny, the panel concluded that the Act unnecessarily chills protected speech in at least three ways: (1) it does not make clear what sex offenders are required to report; (2) it provides insufficient safeguards preventing the public release of the information sex offenders do report; and (3) the 24-hour reporting requirement is onerous and overbroad. The panel concluded that appellees were likely to succeed on the merits of their First Amendment challenge and that the district court did not abuse its

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

discretion in deciding that all the necessary elements for obtaining a preliminary injunction were satisfied.

## COUNSEL

Kamala D. Harris, Attorney General; Douglas J. Woods, Senior Assistant Attorney General; Peter K. Southworth, Supervising Deputy Attorney General; Robert D. Wilson (argued), Deputy Attorney General, Office of the Attorney General of the State of California, Sacramento, California, for Defendant-Appellant.

James C. Harrison (argued), Margaret R. Prinzing, Remcho, Johansen & Purcell, LLP, San Leandro, California, for Intervenors-Appellants.

Michael T. Risher (argued), Linda Lye, American Civil Liberties Union Foundation of Northern California, Inc., San Francisco, California; Hanni Fakhoury, Lee Tien, Electronic Frontier Foundation, San Francisco, California, for Plaintiffs-Appellees.

**OPINION**

BYBEE, Circuit Judge:

California law has long required registered sex offenders to report identifying information, such as their address and current photograph, to law enforcement. Cal. Penal Code §§ 290.012, 290.015. The Californians Against Sexual Exploitation ("CASE") Act sought to supplement and modernize these reporting obligations by requiring sex offenders to provide "[a] list of any and all Internet identifiers established or used by the person" and "[a] list of any and all Internet service providers used by the person." *Id.* § 290.015(a)(4)–(5). The Act also requires registered sex offenders to send written notice to law enforcement within 24 hours of adding or changing an Internet identifier or an account with an Internet service provider ("ISP"). *Id.* § 290.014(b). Appellees Doe, Roe, and the nonprofit organization California Reform Sex Offender Laws filed a complaint alleging that the CASE Act infringes their freedom of speech in violation of the First Amendment. Appellees filed a motion for a preliminary injunction, which the district court granted. Kamala Harris, the Attorney General of California, and Intervenors, the proponents of the CASE Act, appeal. We hold that the district court did not abuse its discretion by enjoining the CASE Act. Accordingly, we affirm.

## I. BACKGROUND

A. *The CASE Act*

"California has had some form of sex offender registration requirement since 1947." *In re Alva*, 92 P.3d

311, 314 (Cal. 2004). Under current California law, "[e]very person . . . residing in California, or while attending school or working in California" who has been convicted of certain sexual crimes must register with the police or sheriff where he or she resides on an annual basis. Cal. Penal Code §§ 290(b)–(c), 290.012(a). The registration law requires even more frequent updates of violent predators: "[E]very person who has ever been adjudicated a sexually violent predator . . . shall, after his or her release from custody, verify his or her address no less than once every 90 days . . . ." *Id.* § 290.012(b).

In 2012, California voters passed Proposition 35, known as the CASE Act, which added provisions to California's sex offender registration requirements related to Internet usage by persons subject to the Act. The new sections require covered persons to provide additional information, including "[a] list of any and all Internet identifiers established or used by the person" and "[a] list of any and all Internet service providers used by the person." *Id.* § 290.015(a)(4), (5). The Act also provides:

> If any person who is required to register pursuant to the Act adds or changes his or her account with an Internet service provider or adds or changes an Internet identifier, *the person shall send written notice* of the addition or change to the law enforcement agency or agencies with which he or she is currently registered *within 24 hours*. The law enforcement agency or agencies shall make this information available to the Department of Justice.

*Id.* § 290.014(b) (emphasis added).[1]  The CASE Act defines the term "Internet identifier" as "an electronic mail address, user name, screen name, or similar identifier used for the purpose of Internet forum discussions, Internet chat room discussions, instant messaging, social networking, or similar Internet communication."  *Id.* § 290.024(b).  The Act defines "Internet service provider" as "a business, organization, or other entity providing a computer and communications facility directly to consumers through which a person may obtain access to the Internet."  *Id.* § 290.024(a).

## B.  *The Proceedings*

Appellees represent a class of registered sex offenders who regularly use the Internet to advocate anonymously on behalf of sex offenders and to comment on news articles, forums, and blogs.  They filed suit on the day the CASE Act

---

[1]  The federal Sex Offender Registration and Notification Act ("SORNA"), enacted as part of the Adam Walsh Child Protection and Safety Act of 2006, gives the states powerful financial incentives to maintain a sex offender registry.  42 U.S.C. §§ 16912 ("Each jurisdiction shall maintain a jurisdiction-wide sex offender registry conforming to the requirements of this subchapter."), 16925(a) (providing that a nonconforming jurisdiction "shall not receive 10 percent of the funds that would otherwise be allocated for that fiscal year to the jurisdiction under . . . the Omnibus Crime Control and Safe Streets Act of 1968").  SORNA requires states to include in their sex offender registries information such as the registrants' names and addresses, as well as "[a]ny other information required by the Attorney General."  *Id.* § 16914(a).  Pursuant to that authority, in 2008 the Attorney General issued guidelines requiring states to collect sex offenders' Internet identifiers and addresses.  National Guidelines for Sex Offender Registration, 73 Fed. Reg. 38030, 38055 (July 2, 2008); *see also* 42 U.S.C. § 16915a(a) (requiring states to obtain registrants' Internet identifiers "of any type that the Attorney General determines to be appropriate").

took effect, asserting that the CASE Act violates their First Amendment rights to freedom of speech and association and that the statutory provisions are void for vagueness in violation of the Fourteenth Amendment.   Appellees successfully moved for a temporary restraining order.  This temporary restraining order remained in effect until the district court ruled on Appellees' motion for a preliminary injunction.   While the motion was pending, the official proponents of the CASE Act, Chris Kelly and Daphne Phung, intervened.

After briefing and a hearing, the district court granted Appellees' motion for a preliminary injunction in a thorough order.  The district court concluded that the Act is content neutral, and so determined to review the Act under an intermediate level of scrutiny.   Before beginning its intermediate scrutiny analysis, however, the district court first considered whether it could permissibly adopt a narrowing construction to clarify ambiguities in the CASE Act.  The district court adopted two narrowing constructions, both of which were agreed upon by the parties.  First, the district court construed the requirement that registrants provide "[a] list of any and all Internet service providers used by the person," *id.* § 290.015(a)(5), as requiring registrants to report only ISPs with which they have an open account at the time of registration, as opposed to ISPs with which the registrant does not have an account but that are nevertheless accessed by the registrant.  Second, the district court limited the term "Internet identifier" to require registrants to report only identifiers they actually use to engage in "interactive communication" on a website, and not identifiers they use solely to purchase products or read content online.

Even with these narrowing constructions, however, the district court determined that the CASE Act is not narrowly tailored to serve the government's important interest in combating human trafficking and sexual exploitation because "the challenged provisions, when combined with the lack of protections on the information's disclosure and the serious penalty registrants face if they fail to comply with the reporting requirements, create too great a chilling effect to pass constitutional muster." The district court further concluded that loss of First Amendment freedoms is an irreparable injury and that "the balance of equities and the public interest weigh in favor of granting injunctive relief." Accordingly, the district court granted the motion for a preliminary injunction and enjoined the State "from implementing or enforcing California Penal Code sections 290.014(b) and 290.015(a)(4)–(6), as enacted by the CASE Act."

The State and Intervenors appealed.

## II. STANDARD OF REVIEW

The standard for issuing a preliminary injunction is well established:

> A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The application of this standard in First Amendment cases involves "an inherent tension: the moving party bears the burden of showing likely success on the merits—a high burden if the injunction changes the status quo before trial—and yet within that merits determination the government bears the burden of justifying its speech-restrictive law." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1115 (9th Cir. 2011). Accordingly, "in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction." *Id.* at 1116.

We review a district court's decision to grant or deny a preliminary injunction for abuse of discretion. *Id.* at 1115. We review the district court's legal conclusions de novo, and the district court's findings of fact for clear error. *Id.* When reviewing under this standard, we will not reverse the district court's decision "simply because [we] would have arrived at a different result if [we] had applied the law to the facts of the case." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

### A. *Likelihood of Success on the Merits*

Appellees' First Amendment challenge rests on two premises: first, that registered sex offenders are entitled to full First Amendment protection, and second, that the Case Act warrants First Amendment scrutiny. Concluding that

registered sex offenders enjoy full First Amendment protection, and that the Act warrants First Amendment scrutiny, we apply intermediate scrutiny and conclude, as did the district court, that Appellees are likely to succeed on the merits of their First Amendment challenge.[2]

1. Scope of First Amendment Protection Afforded to Registered Sex Offenders

As the district court noted, both sides in this litigation agree that "speech by sex offenders who have completed their terms of probation or parole enjoys the full protection of the First Amendment." We agree, but we think it is important to understand why, because when a convict's constitutional rights are at issue, his present status "on a continuum of possible punishments" may be a relevant consideration. *Samson v. California*, 547 U.S. 843, 848 (2006) (internal quotation marks omitted).

On the one end of the continuum is incarceration, which "brings about the necessary withdrawal or limitation of many privileges and rights." *Price v. Johnston*, 334 U.S. 266, 285 (1948), *overruled on other grounds by McCleskey v. Zant*, 499 U.S. 467 (1991). "These constraints on inmates, and in some cases the complete withdrawal of certain rights, are 'justified by the considerations underlying our penal system.'" *Hudson v. Palmer*, 468 U.S. 517, 524 (1984) (quoting *Price*, 334 U.S. at 285). Accordingly, inmates only

---

[2] Because we agree with the district court that Appellees are likely to succeed on their freedom of speech claims, we decline to address their vagueness and freedom of association claims. *See Badea v. Cox*, 931 F.2d 573, 575 n.2 (9th Cir. 1991) ("[W]e see no reason to decide *ab initio* issues that the district court has not had an opportunity to consider. . . .").

"retain[] those First Amendment rights that are not inconsistent with [their] status as . . . prisoner[s] or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974).

Parole (or supervised release, in the federal system)[3] is one step removed from imprisonment. "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Morrissey v. Brewer*, 408 U.S. 471, 477 (1972). Although parolees "should enjoy greater freedom in many respects than a prisoner, . . . the Government may . . . impose restrictions on the rights of the parolee that are reasonably and necessarily related to the [Government's] interests." *Birzon v. King*, 469 F.2d 1241, 1243 (2d Cir. 1972). For example, we have upheld Internet monitoring as a condition of release for parolees who were convicted of downloading child pornography. *See, e.g.*, *United States v. Quinzon*, 643 F.3d 1266, 1272–73 (9th Cir. 2011); *United States v. Goddard*, 537 F.3d 1087, 1090 (9th Cir. 2008). But, because parolees retain some of their First Amendment rights we have also struck conditions of release that unreasonably burdened those rights. *See, e.g.*, *United States v. Barsumyan*, 517 F.3d 1154, 1161–62 (9th Cir. 2008) (holding that the sentencing court plainly erred in imposing a restriction on all computer use as a condition of supervised release); *United States v. Sales*, 476 F.3d 732, 736 (9th Cir. 2007) (holding that a condition of

---

[3] "The federal system has abolished parole, and uses supervised release to supervise felons after they get out of prison. People on supervised release have not completed their sentences, they are serving them." *United States v. Betts*, 511 F.3d 872, 876 (9th Cir. 2007) (footnote omitted).

release that required computer monitoring "result[ed] in a far greater deprivation of [the defendant]'s liberty than [wa]s reasonably necessary" in light of the nature of the counterfeiting offense and the defendant's history and characteristics).

Probation is less restrictive than parole, though it is still on the continuum of state-imposed punishments. *See Samson*, 547 U.S. at 850 ("[P]arole is more akin to imprisonment than probation is to imprisonment."); *id*. ("[O]n the Court's continuum of possible punishments, parole is the stronger medicine; ergo, parolees enjoy even less of the average citizen's absolute liberty than do probationers." (alteration in original) (quoting *United States v. Cardona*, 903 F.2d 60, 63 (1st Cir. 1990))).   Unlike parole, which is imposed in addition to imprisonment,  probation is "meted out . . . in lieu of[] incarceration." *Cardona*, 903 F.2d at 63. Although probation is a less restrictive criminal sanction, the government may still "impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *United States v. Knights*, 534 U.S. 112, 119 (2001).

Here, the plaintiffs fall into yet another category.  They are not prisoners, parolees, or probationers.  Doe and Roe were convicted of sex-related crimes more than two decades ago and have completed their terms of probation and parole. Although they remain subject to reporting requirements, sex offenders like Doe and Roe are no longer on the "continuum" of state-imposed punishments. *Samson*, 547 U.S. at 850; *see also Williamson v. Gregoire*, 151 F.3d 1180, 1181 (9th Cir. 1998) ("Although Williamson's criminal punishment has come to an end, he must now register as a sex offender . . . .").   As we explained in *Williamson*, sex offender

registration "is more properly characterized as a collateral consequence of conviction rather than as a restraint on liberty." *Id.* at 1183.

Of course, if Doe, Roe, or other sex offenders fail to follow California's registration requirements, they are subject to criminal sanctions, which in California can be harsh. *See Gonzalez v. Duncan*, 551 F.3d 875, 889 (9th Cir. 2008) (holding that a sentence of 28 years to life under California's "three strikes" law for filing a sex offender registration update three months late violated the Eighth Amendment); *id.* at 887–88 (comparing California's registration and sentencing scheme with other states). But such sanctions are not the same as having parole or probation revoked; rather, they constitute a new criminal penalty altogether. So while registered sex offenders suffer from the effects of their crimes, they are no longer subject to formal punishment. We accordingly agree with the district court that registered sex offenders who have completed their terms of probation and parole "enjoy[] the full protection of the First Amendment."

2.  First Amendment Scrutiny

In evaluating the CASE Act, we must determine in the first instance whether the Act implicates the First Amendment. Appellants are correct that, on its face, the CASE Act does not prohibit speech. But a law may burden speech—and thereby regulate it—even if it stops short of prohibiting it. Indeed, "the 'distinction between laws burdening and laws banning speech is but a matter of degree.'" *Sorrell v. IMS Health, Inc.*, 131 S. Ct. 2653, 2664 (2011) (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 812 (2000)).

There can be little doubt that requiring a narrow class of individuals to notify the government within 24 hours of engaging in online communication with a new identifier significantly burdens those individuals' ability and willingness to speak on the Internet. *See* Cal. Penal Code § 290.014(b). Of course, that the law targets registered sex offenders might not be troublesome by itself—federal and state laws already impose reporting requirements on that same group, and those laws have not been thought to be unconstitutional because registrants must spend time to fill out paperwork that they otherwise might have spent engaging in First Amendment activities. *Cf. Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986) ("One liable for a civil damages award has less money to spend on paid political announcements or to contribute to political causes, yet no one would suggest that such liability gives rise to a valid First Amendment claim.").

But the CASE Act burdens sex offenders precisely when they are engaged in one activity—communicating through the Internet. In that respect, this case is similar to *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983). There, the state imposed a tax on the cost of ink and paper, but it exempted the first $100,000 worth of material. As a consequence, only a small number of large newspaper publishers were subject to the tax. *Id.* at 578–79. The Supreme Court began with the common-sense proposition that the government "can subject newspapers to generally applicable economic regulations without creating constitutional problems." *Id.* at 581. But Minnesota's special use tax, the Court determined, was not a generally applicable economic regulation that merely incidentally burdened publications in their exercise of free speech. *See id.* Instead, it "singled out the press for special treatment" and "applie[d]

only to certain publications protected by the First Amendment." *Id.* at 581, 582. The Court thus subjected the use tax to First Amendment scrutiny rather than analyzing it as an equal protection issue. *See id.* at 582, 585 n.7.

Just as the tax on paper and ink in *Minneapolis Star* inevitably burdened specific publishers' ability to engage in free speech, so too does the CASE Act's 24-hour reporting requirement inevitably burden sex offenders' ability to engage in protected speech on the Internet. Indeed, the purpose of the Act is to collect Internet identifiers that sex offenders use "for the purpose of Internet forum *discussions*, Internet chat room *discussions*, instant *messaging*, social *networking*, or similar Internet *communication*." Cal. Penal Code § 290.024(b) (emphasis added). Moreover, the burden here is substantial—the Act conditions Internet speech with a new identifier on a registrant's affirmative act of sending written notice to the police within 24 hours. *Cf. Lamont v. Postmaster Gen.*, 381 U.S. 301, 307 (1965) (holding that a law requiring addressees of "communist political propaganda" to request in writing that the mailing be delivered violated the addressees' First Amendment rights because the law imposed an impermissible "affirmative obligation" and was "almost certain to have a deterrent effect"). And if that was not enough of a burden, the Act's reporting requirement carries with it the threat of criminal sanctions.

For the very reasons this case is like *Minneapolis Star* and *Lamont*, it is nothing like *Arcara*, a case urged on us by Appellants. In *Arcara*, the Supreme Court held that the First Amendment was not implicated by the enforcement of a public health regulation authorizing the government to close premises used for prostitution merely because the premises at

issue were also used as an adult bookstore. 478 U.S. at 704–07. The Court distinguished *Minneapolis Star* because the statute in *Minneapolis Star* "ha[d] the inevitable effect of singling out those engaged in expressive activity." *Id.* at 707. By contrast, the closure sanction at issue in *Arcara* "was directed at unlawful conduct having nothing to do with books or other expressive activity." *Id.* Here, we cannot say that the CASE Act has nothing to do with First Amendment activity. To the contrary, the CASE Act directly and exclusively burdens speech, and a substantial amount of that speech is clearly protected under the First Amendment—just as the Act burdens sending child pornography and soliciting sex with minors, it also burdens blogging about political topics and posting comments to online news articles.[4]

The Act also has the inevitable effect of burdening sex offenders' ability to engage in *anonymous* online speech. Appellees allege that the Act allows law enforcement to disclose their identifying information to the public without imposing sufficient constraints on law enforcement's discretion to do so. The Supreme Court has subjected speaker regulations—such as disclosure requirements—to

---

[4] Appellants argue that Proposition 35 updates California's sex offender registration law to make it a "generally applicable governmental regulation" of the kind at issue in *Arcara* because "[f]ar from 'singling out' Internet-related activities for special burdens, Proposition 35 seeks to extend the same registration requirements that apply in the physical world to the virtual world." For example, Appellants note, "if a registrant uses an alias to send a letter to the newspaper editor, he must report that alias to law enforcement." But the law's applicability to both Internet and non-Internet speech only means that the law is more speech restrictive. It does not make the law "generally applicable" *to all speakers* like the anti-prostitution law in *Arcara*. Indeed, it is still precisely the same group of individuals that is singled out.

First Amendment scrutiny.  For example, in *McIntyre v. Ohio Elections Commission*, the Court held that an Ohio statute that required leafleters to put their names on campaign literature "undeniably impede[d] protected First Amendment activity." 514 U.S. 334, 355 (1995).  As the Court explained, "an author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.* at 342.  Relying on *McIntyre*, the Court similarly held that a Colorado law that required initiative-petition circulators to wear an identification badge deterred speech.  *Buckley v. Amer. Constitutional Law Found., Inc.*, 525 U.S. 182, 200 (1999).

We have explained, moreover, that "[a]lthough the Internet is the latest platform for anonymous speech, online speech stands on the same footing as other speech—there is 'no basis for qualifying the level of First Amendment scrutiny that should be applied' to online speech." *In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011) (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 870 (1997)).  First Amendment scrutiny is thus also warranted because the Act burdens registered sex offenders' willingness to engage in anonymous online speech.

Accordingly, because the Act imposes a substantial burden on sex offenders' ability to engage in legitimate online speech, and to do so anonymously, we conclude that First Amendment scrutiny is warranted.

3.  Level of Scrutiny

Having determined that some level of First Amendment scrutiny is warranted, we now determine which level.  In the

First Amendment context, the level of scrutiny to be applied depends upon the "'content neutrality' of the statute." *Hill v. Colorado*, 530 U.S. 703, 719 (2000). Content-based regulations are subject to the most exacting scrutiny because the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). By contrast, "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). So, "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

We conclude that the CASE Act is content neutral. On its face, the Act makes no reference to specific subject matters or viewpoints. And unlike the registration laws in other states, California's CASE Act does not prohibit registered sex offenders from using particular websites, or any particular types of communication. *Compare* Cal. Penal Code § 290 *et seq. with* N.C. Gen. Stat. § 14-202.5 (2013) (banning the use of commercial social networking websites by any registered sex offender) *and* Ind. Code § 35-42-4-12 (2014) (prohibiting sex offenders from using social networking websites, instant messaging services, and chat room programs). Instead, the CASE Act broadly applies to *all* identifiers that a registrant uses for online communication, regardless of whether he uses the identifier to chat, post product reviews, or ask questions about a credit card bill. In that respect, the law may be broad, but at least it is content neutral.

The more difficult question is whether the CASE Act is subject to strict scrutiny because it makes speaker-based distinctions. In *Ward*, the Supreme Court declared that "[a] regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." 491 U.S. at 791. More recently, however, the Court held in *Citizens United v. Federal Election Commission* that the First Amendment prohibits "restrictions distinguishing among different speakers; allowing speech by some but not others." 558 U.S. 310, 340 (2010). The Court explained that "[s]peech restrictions based on the identity of the speaker are all too often simply a means to control content," and that "[b]y taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice." *Id.* at 340–41. The Court thus applied strict scrutiny to the ban on political speech as a non-content neutral restriction.

Here, although it is true that the Act singles out registered sex offenders as a category of speakers, it does not target political speech content, nor is it a ban on speech. *See id.* at 339 (observing that the restrictions constituted a "ban on speech" and that "[t]he First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office'" (citation omitted)). In the context of laws that burden speech but do not ban it, the test is not merely whether a law singles out individuals—many speech-burdening laws do. The test is whether the speech-burdening restrictions "are *justified* without reference to the content of the regulated speech." *Boos v. Barry*, 485 U.S. 312, 320 (1988) (emphasis in original) (quoting *Renton v. Playtime*

*Theatres, Inc.*, 475 U.S. 41, 48 (1986)) (internal quotation marks omitted).

The Supreme Court's decision in *Turner Broadcasting* is instructive. At issue in that case were rules requiring cable television systems to devote a portion of their channels to the transmission of local broadcast television stations. 512 U.S. at 626. The Court acknowledged that these "must-carry" provisions "distinguish[ed] between speakers in the television programming market"—over-the-air broadcasters were favored, while cable programmers and cable operators were burdened by the carriage obligations. *Id.* at 645. Nevertheless, the provisions "d[id] so based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry." *Id.* The Court reasoned that so long as such speaker distinctions "[we]re not a subtle means of exercising a content preference," the otherwise content-neutral provisions were not subject to strict scrutiny. *Id.* Reviewing the statute and its various legislative findings, the Court was persuaded "that Congress' overriding objective in enacting must-carry was not to favor programming of a particular subject matter, viewpoint, or format, but rather to preserve access to free television programming for the 40 percent of Americans without cable." *Id.* at 646. The Court thus reviewed the must-carry provisions under an intermediate level of scrutiny. *Id.* at 661–62.

Here as well, the CASE Act does not target speakers or the forum in a way that suggests that the restrictions are a proxy for content regulation. The Act's purpose is clear: It is to "combat the crime of human trafficking" and to "strengthen laws regarding sexual exploitation, including sex offender registration requirements, to allow law enforcement

to track and prevent online sex offenses and human trafficking."  Proposition 35, Californians Against Sexual Exploitation Act, § 3(1), (3).  Although we conclude that the Act burdens protected speech, nothing in the Act suggests that the Act's purpose was to disfavor any particular viewpoint or subject matter.  We therefore conclude that "the appropriate standard by which to evaluate the constitutionality of [the Act] is the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech."  *Turner*, 512 U.S. at 662.

Our conclusion finds support in the decisions of other courts that have considered registration requirements similar to those found in the CASE Act.  The Tenth Circuit, for example, has held that Utah's reporting law, which requires sex offenders to provide all Internet identifiers and their corresponding websites, was a "content-neutral regulation . . . subject to intermediate scrutiny."  *Doe v. Shurtleff*, 628 F.3d 1217, 1223 (10th Cir. 2010).  Similarly, the Seventh Circuit has held that an Indiana statute, which prohibited certain sex offenders from using social networking sites, instant messaging, or chat rooms that are accessible to minors, was "content neutral because it restrict[ed] speech without reference to the expression's content" and was therefore subject to intermediate scrutiny.  *Doe v. Prosecutor, Marion Cnty., Ind.*, 705 F.3d 694, 698 (7th Cir. 2013).  Other courts have concluded likewise.  *See, e.g.*, *Doe v. Nebraska*, 898 F. Supp. 2d 1086, 1093 1107–08 (D. Neb. 2012) (Nebraska statute that required sex offenders to disclose "remote communication device identifiers, addresses, domain names, and Internet and blog sites used" was subject to intermediate scrutiny); *White v. Baker*, 696 F. Supp. 2d 1289, 1307–08 (N.D. Ga. 2010) (Georgia statute requiring sex offenders to produce their email addresses, usernames, and password was

subject to intermediate scrutiny); *State v. Packingham*, 748 S.E.2d 146, 149–50 (N.C. App. 2013) (North Carolina statute banning use of social networking sites by sex offenders was subject to intermediate scrutiny). We join these courts that have reviewed similar laws, and apply intermediate scrutiny to the CASE Act.

### 4. Intermediate Scrutiny Analysis

Content-neutral restrictions on protected speech survive intermediate scrutiny so long as "'they are narrowly tailored to serve a significant governmental interest, and . . . leave open ample alternative channels for communication of the information.'" *Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). "To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests." *Turner*, 512 U.S. at 662. Rather, the test is whether "the means chosen . . . 'burden[s] substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* (quoting *Ward*, 491 U.S. at 799); *see Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 947 (9th Cir. 2011) (en banc). The government must also "demonstrate that the recited harms are real . . . and that the regulation will in fact alleviate these harms in a direct and material way." *Turner*, 512 U.S. at 664.

The CASE Act is clearly intended to serve a legitimate interest. The Act's stated purpose is to "combat the crime of human trafficking" and "to strengthen laws regarding sexual exploitation, including sex offender registration requirements, to allow law enforcement to track and prevent online sex offenses and human trafficking." Proposition 35, § 3(1), (3).

The Act declares that protecting people in California "from all forms of sexual exploitation is of paramount importance." *Id.* § 2(1). It further recites that "[w]hile the rise of the Internet has delivered great benefits to California, the predatory use of this technology by human traffickers and sex offenders has allowed such exploiters a new means to entice and prey on vulnerable individuals" and that the Act will "deter predators from using the Internet to facilitate human trafficking and sexual exploitation." *Id.* § 2(4), (6).

Unquestionably, the State's interest in preventing and responding to crime, particularly crimes as serious as sexual exploitation and human trafficking, is legitimate. We have observed that there is a "strong link between child pornography and the Internet, and the need to protect the public, particularly children, from sex offenders." *United States v. Rearden*, 349 F.3d 608, 621 (9th Cir. 2003) (internal quotation marks omitted); *see also City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 435 (2002) (plurality opinion) ("[W]e find that reducing crime is a substantial government interest . . . ."); *Doe v. Prosecutor*, 705 F.3d at 698 ("Indiana is certainly justified in shielding its children from improper sexual communication."); *Shurtleff*, 628 F.3d at 1223 ("We have no doubt that the State of Utah has a compelling interest in investigating kidnapping and sex-related crimes."); *White*, 696 F. Supp. 2d at 1308 ("[Georgia] has an interest in protecting against internet abuse of children."). California has a substantial interest in protecting vulnerable individuals, particularly children, from sex offenders, and the use of the Internet to facilitate that exploitation is well known to this Court. *See*, *e.g.*, *United States v. Curtin*, 588 F.3d 993 (9th Cir. 2009); *United States v. Daniels*, 541 F.3d 915 (9th Cir. 2008); *United States v. Stoterau*, 524 F.3d 988 (9th Cir. 2008).

Although California clearly has a legitimate interest, the more difficult question is whether the means California has chosen "'burden[s] substantially more speech than is necessary to further the government's legitimate interests.'" *Turner*, 512 U.S. at 662 (quoting *Ward*, 491 U.S. at 799). "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

We conclude that the CASE Act unnecessarily chills protected speech in at least three ways: the Act does not make clear what sex offenders are required to report, there are insufficient safeguards preventing the public release of the information sex offenders do report, and the 24-hour reporting requirement is onerous and overbroad. We address each of these concerns in turn.

    a.   Ambiguities in the Act

First, the Act is unclear as to what it requires registered sex offenders to provide. The district court—at the urging of the State—adopted narrowing constructions to clarify the meanings of "Internet identifier" and "Internet service provider." The district court construed the Act's requirement that Internet identifiers be reported to require only reporting of identifiers used to engage in "interactive communication," not those used for shopping or reading content. It also construed the Act to require a registered sex offender to report a new Internet identifier only once he or she actually uses the identifier for a communicative purpose. As to ISPs,

the district court construed the Act to require disclosure only of ISPs with which registered sex offenders have an open account, and not friends' or family members' accounts or publicly available WiFi that does not require an account.

Despite the district court's valiant effort at applying narrowing constructions, we are reluctant to adopt a narrowing construction where, as here, the terms of the statute itself—including its definition section—are ambiguous and arguably inconsistent. *See White*, 696 F. Supp. 2d at 1312 (holding that a statute using the term "interactive online communication" chilled a sex offender's right to anonymous free speech because the term is too ambiguous). Although we will adopt a narrowing construction where a contrary construction might raise "serious constitutional doubts," we can "impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *Reno*, 521 U.S. at 884 (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 397 (1988)).

First, the Act is not readily susceptible to the district court's limitation of the Act to require registered sex offenders to report only new Internet identifiers that a sex offender actually uses for a communicative purpose. Although it is true that the Act in one place refers only to "identifier[s] *used* for the purpose of . . . Internet communication," Cal. Penal Code § 290.024(b) (emphasis added), elsewhere the Act requires registered sex offenders to provide "[a] list of any and all Internet identifiers *established or used* by the person," *id.* § 290.015(a)(4) (emphasis added). Similarly, the Act is not readily susceptible to the district court's limitation of the Act to require registered sex offenders to report only ISPs with which they have an open

account. Again, the Act is inconsistent. One provision requires registered sex offenders to report when they add or change an "*account* with an Internet service provider," *id.* § 290.014(b) (emphasis added), but another provision requires them to disclose "any and all Internet service providers *used* by the person," § 290.015(a)(5) (emphasis added).[5]

And even if the Act were readily susceptible to the constructions adopted by the district court, our adoption of those constructions would not necessarily alleviate the chilling effect caused by the ambiguities in the Act. As the district court noted, "[t]he uncertainty surrounding what registrants must report—and the resultant potential chilling effect—is greater in this case because the [district court's] interpretation of the Act is not definitive guidance to registrants about what they must report" because it "is not binding on state courts, where the registrants would face prosecution for failure to register."

Thus, whether narrowly construed or not, the ambiguities in the statute may lead registered sex offenders either to overreport their activity or underuse the Internet to avoid the difficult questions in understanding what, precisely, they must report. "This uncertainty undermines the likelihood that the [Act] has been carefully tailored to the [State's] goal of protecting minors" and other victims. *Reno*, 521 U.S. at 871.

---

[5] The broader reporting requirement found in § 290.015(a)(5)—requiring registered sex offenders to report ISPs that they *use*, which presumably can include hot spots and open wireless systems—is entirely consistent with the Act's definition of the term "Internet service provider" as any "entity . . . through which a person may obtain access to the Internet." Cal. Penal Code § 290.024(a).

And this uncertainty is particularly troubling because unclear laws inevitably lead citizens to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (alteration in original) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).

The State suggests that even if the CASE Act is unclear, registrants have the opportunity to ask questions when annually registering in person, and if a registrant makes an honest mistake, he or she will not be prosecuted because the law only penalizes *knowing* failure to register. But notwithstanding the State's assurances that it will not prosecute "honest mistakes," "we cannot assume that, in its subsequent enforcement, ambiguities will be resolved in favor of adequate protection of First Amendment rights." *NAACP v. Button*, 371 U.S. 415, 438 (1963).

We therefore conclude that the Act's ambiguities as to what registrants are required to report, combined with the criminal sanctions for failure to report, unnecessarily chill protected speech.

### b.   Standards for release of identifying information

Second, the Act burdens registered sex offenders' ability to engage in anonymous online speech. Our nation has "a respected tradition of anonymity in the advocacy of political causes." *McIntyre*, 514 U.S. at 343. This tradition is worth protecting because "[a]nonymity . . . provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent." *Id.* at 342. "Accordingly, an author's decision to remain anonymous, like other decisions

concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *Id.*

Although this is not what some might call the classic anonymous-speech case, where speakers allege they are required to disclose their identities directly to their audience, we conclude that the Act nevertheless chills anonymous speech because it too freely allows law enforcement to disclose sex offenders' Internet identifying information to the public. California's sex offender registration law provides that, in general, information provided by registered sex offenders "shall not be open to inspection by the public." Cal. Penal Code § 290.021. But in order "to allow members of the public to protect themselves and their children from sex offenders," *id.* § 290.45(a)(2), the Act now provides that

> [n]otwithstanding any other provision of law, . . . any designated law enforcement entity may provide information to the public about a person required to register as a sex offender pursuant to Section 290, by whatever means the entity deems appropriate, *when necessary to ensure the public safety* based upon information available to the entity concerning that specific person.

*Id.* § 290.45(a)(1) (emphasis added).[6]

---

[6] Notably, § 290.45 prohibits law enforcement agencies from disseminating such information through the Internet. Cal. Penal Code § 290.45(c)(1).

The problem is that § 290.45(a)(1) contains no standards for judging what is "necessary to ensure the public safety." Without such standards, the Act impermissibly "plac[es] unbridled discretion in the hands of a government official or agency." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). In *Lakewood*, a municipal ordinance gave the mayor the right to grant or deny applications for newsrack permits on public property. If the mayor denied the application, he had to state the reasons for the denial. According to the Court, "nothing in the law as written require[d] the mayor to do more than make the statement 'it is not in the public interest' when denying a permit application." *Id*. at 769. The Court rejected the idea that it should presume the mayor would deny permits "only for reasons related to the health, safety, or welfare of Lakewood citizens." *Id.* at 770. Without limits "made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice," the constraints on the mayor's authority were "illusory." *Id.* at 769–70.

We cannot find any constraining principle in § 290.45. "Public safety"—like "public interest"—is much too broad a concept to serve as an effective constraint on law enforcement decisions that may infringe First Amendment rights.[7]  *See White*, 696 F. Supp. 2d at 1311 (expressing

---

[7] For this reason, this case is distinguishable from the Tenth Circuit's decision in *Doe v. Shurtleff*, which upheld the constitutionality of Utah's sex offender registration statute. In that case, the Utah legislature amended its sex offender registration statute after the statute was found unconstitutional by the district court. Reviewing the amended statute, the Tenth Circuit determined that Utah had limited law enforcement officials' use of Internet identifiers to "investigating kidnapping and sex-related crimes" and only permitted them to share such information "among law enforcement agencies, not the public at large." 628 F.3d at 1221, 1225.

concern about a law allowing law enforcement to disclose sex offenders' Internet identifiers "to protect the public" because "[i]t is conceivable, if not predictable, that a person in law enforcement might determine that Internet Identifiers for offenders ought to be released so that the public can search for and monitor communications which an offender intends to be anonymous"). And the promise from the State that it will use the power appropriately is not sufficient: "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

The State argues that the Act, construed with existing constraints on law enforcement activities, cabins the discretion of law enforcement officials to use Internet identifying information because

> to conduct investigation or surveillance, "specific and articulable facts causing the officer to suspect that some activity relating to crime has taken place or is occurring or about to occur" are *required* and the suspicion "that the person he or she intends to place under surveillance is involved in that activity" is also *required*.

---

Given the limited purposes for which identifiers could be shared among law enforcement agencies, the court concluded that "the statute include[d] sufficient restrictions so as not to unnecessarily chill Mr. Doe's speech." *Id.* at 1225.

But these general principles of good police practices for *investigation* or *surveillance* tell us nothing about the kind of judgment required by § 290.45 for disclosure of information to the public "when necessary to ensure the public safety."

We do not believe that law enforcement would ignore § 290.45—that section also penalizes law enforcement's misuse of sex offenders' private information. But sex offenders' fear of disclosure in and of itself chills their speech. If their identity is exposed, their speech, even on topics of public importance, could subject them to harassment, retaliation, and intimidation. *See McIntyre*, 514 U.S. at 341–42 ("The decision in favor of anonymity may be motivated by fear of economic or official retaliation, by concern about social ostracism, or merely by a desire to preserve as much of one's privacy as possible."); *Brown v. Socialist Workers '74 Campaign Comm. (Ohio)*, 459 U.S. 87, 100 (1982) (holding that disclosure requirements may subject unpopular minority groups to "threats, harassment, and reprisals"). Anonymity may also be important to sex offenders engaged in protected speech because it "provides a way for a writer who may be personally unpopular to ensure that readers will not prejudge her message simply because they do not like its proponent." *McIntyre*, 514 U.S. at 342; *see also Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1092 (W.D. Wash. 2001) ("Internet anonymity facilitates the rich, diverse, and far ranging exchange of ideas.").

We thus agree with the district court that the standards for releasing Internet identifying information to the public are inadequate to constrain the discretion of law enforcement agencies and that, as a result, registered sex offenders are unnecessarily deterred from engaging in anonymous online speech.

c. 24-hour reporting requirement

Third, the Act's 24-hour update requirement "undeniably impedes protected First Amendment activity." *McIntyre*, 514 U.S. at 355. Although registered sex offenders do not have to register *before* they communicate online, they must register within 24 hours of using a new Internet identifier—a shorter time than is given by registration laws in other jurisdictions. *See, e.g.*, *White*, 696 F. Supp. 2d at 1294 (Georgia statute requiring registrants to provide updated information within 72 hours). This burden is particularly onerous for sex offenders who live in remote areas or who, like other citizens, have multiple Internet identifiers. *See Doe v. Nebraska*, 898 F. Supp. 2d. at 1122 (granting a preliminary injunction because a blog-reporting requirement that "[r]equir[ed] sex offenders to constantly update the government . . . [wa]s unnecessarily burdensome and . . . [wa]s likely to deter the offender from engaging in speech that is perfectly appropriate").

Moreover, anytime registrants want to communicate with a new identifier, they must assess whether the message they intend to communicate is worth the hassle of filling out a form, purchasing stamps, and locating a post office or mailbox. The mail-in requirement is not only psychologically chilling, but physically inconvenient, since whenever a registered sex offender obtains a new ISP or Internet identifier, he must go somewhere else within 24 hours to mail that information to the State. *Cf. Lamont*, 381 U.S. at 307 (holding that a law requiring addressees of "communist political propaganda" to request in writing that the mailing be delivered "[wa]s almost certain to have a deterrent effect").

The Act's 24-hour reporting requirement thus undoubtedly chills First Amendment Activity. Of course, that

chilling effect is only exacerbated by the possibility that criminal sanctions may follow for failing to update information about Internet identifiers or ISP accounts. *See NAACP*, 371 U.S. at 433 ("The threat of sanctions may deter the[] exercise [of First Amendment rights] almost as potently as the actual application of sanctions.").

The 24-hour reporting requirement is not only onerous, it is also applied in an across-the-board fashion. The requirement applies to all registered sex offenders, regardless of their offense, their history of recidivism (or lack thereof), or any other relevant circumstance. And the requirement applies to all websites and all forms of communication, regardless of whether the website or form of communication is a likely or even a potential forum for engaging in illegal activity. (If for example a sex offender establishes a username on a news outlet's website for purposes of posting comments to news articles, it is hard to imagine how speedily reporting that identifier will serve the government's interests.) In short, we have a hard time finding even an attempt at narrow tailoring in this section of the Act. *See White*, 696 F. Supp. 2d at 1309 ("A regulatory scheme designed to further the state's legitimate interest in protecting children from communication enticing them into illegal sexual activity should consider how and where on the internet such communication occurs.").

\* \* \*

Because the CASE Act's requirements are not clear, the information may be too freely shared with the public, and the 24-hour reporting requirement is onerous and overbroad, we conclude that Appellees are likely to prevail on their claim

that the CASE Act unnecessarily deters registered sex offenders from engaging in legitimate expressive activity.[8]

## B. *Irreparable Harm, Balance of Equities, and the Public Interest*

"Even where a plaintiff has demonstrated a likelihood of success on the merits of a First Amendment claim, he 'must also demonstrate that he is likely to suffer irreparable injury in the absence of a preliminary injunction, and that the balance of equities and the public interest tip in his favor.'" *Thalheimer*, 645 F.3d at 1128 (quoting *Klein v. City of San Clemente*, 584 F.3d 1196, 1207 (9th Cir. 2009)). We do not simply assume that these elements "collapse into the merits of the First Amendment claim." *Id.* (internal quotation marks and citation omitted).

Here, we conclude that the district court did not abuse its discretion in deciding that all the necessary elements for obtaining a preliminary injunction are satisfied. We have held that the "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). A "colorable First Amendment claim" is "irreparable injury sufficient to merit the grant of relief," *Warsoldier v. Woodford*, 418 F.3d 989,

---

[8] Because we conclude that the Act burdens substantially more protected speech than is necessary, we decline to decide whether California's sex offender registration statute actually advances the government's legitimate interests. We likewise decline to consider whether there are ample alternative channels available for registered sex offenders to speak.

1001 (9th Cir. 2005) (internal quotation marks omitted), and "[i]f the underlying constitutional question is close . . . we should uphold the injunction and remand for trial on the merits." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 664–65 (2004).

As to the balance of equities, we recognize that while the preliminary injunction is pending, there will be some hardship on the State. Nevertheless, the balance of equities favors Appellees, whose First Amendment rights are being chilled. This is especially so because the Act under scrutiny imposes criminal sanctions for failure to comply. "Where a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech." *Id.* at 670–71.

Finally, the public interest favors the exercise of First Amendment rights. Although we appreciate the State's significant interest in protecting its citizens from crime, nothing in the record suggests that enjoining the CASE Act would seriously hamper the State's efforts to investigate online sex offenses, as it can still employ other methods to do so. On the other hand, we "have consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002).

### III.  CONCLUSION

The district court did not abuse its discretion by granting Appellees' motion to preliminarily enjoin provisions of the CASE Act. The district court's judgment is

**AFFIRMED.**