FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



| | |
|---|---|
| RITESH TANDON; KAREN BUSCH; TERRY GANNON; CAROLYN GANNON; JEREMY WONG; JULIE EVARKIOU; DHRUV KHANNA; CONNIE RICHARDS; FRANCES BEAUDET; MAYA MANSOUR,<br><br>Plaintiffs-Appellants,<br><br>v.<br><br>GAVIN NEWSOM; XAVIER BECERRA; SANDRA SHEWRY; ERICA PAN; JEFFREY V. SMITH; SARA H. CODY,<br><br>Defendants-Appellees. | No. 21-15228<br><br>D.C. No. 5:20-cv-07108-LHK<br>Northern District of California,<br>San Jose<br><br>ORDER |

Before: M. SMITH, BADE, and BUMATAY, Circuit Judges.

Order by Judges M. SMITH and BADE, Partial Dissent and Partial Concurrence by Judge BUMATAY

This appeal challenges the district court's February 5, 2021 order denying Appellants' motion for a preliminary injunction. Appellants now move for an emergency injunction pending appeal, seeking to prohibit the enforcement of California's restrictions on private "gatherings" and various limitations on businesses as applied to Appellants' in-home Bible studies, political activities, and business operations. We conclude that the Appellants have not satisfied the

requirements for the extraordinary remedy of an injunction pending appeal. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). Therefore, we deny the emergency motion.

## I.

## A.

In the district court, Appellants challenged the State's and Santa Clara County's restrictions on private "gatherings." However, in this motion, Appellants limit their challenges to the State's restrictions.[1] These restrictions "appl[y] to private gatherings, and all other gatherings not covered by existing sector guidance are prohibited." Cal. Dep't of Pub. Health, *Guidance for the Prevention of COVID-19 Transmission for Gatherings*, https://cdph.ca.gov/programs/cid/dcdc/pages/covid-19/guidance-for-the-prevention-of-covid-19-transmission-for-gatherings-november-2020.aspx (last visited Mar. 30, 2021). "Gatherings are defined as social situations that bring

---

[1] The State restrictions assign counties to different tiers based on factors such as adjusted COVID-19 case rates, positivity rates, a health equity metric, and vaccination rates. *See* Cal. Dep't of Pub. Health, *Blueprint for a Safer Economy*, https://covid19.ca.gov/safer-economy/#tier-assignments (last visited Mar. 30, 2021). These tiers are assigned number and color designations in descending order of risk: Widespread (Tier 1 or purple); Substantial (Tier 2 or red); Moderate (Tier 3 or orange); and Minimal (Tier 4 or yellow). *See id.* Appellants reside in Santa Clara County, which is currently a Tier 2 county.

together people from different households at the same time in a single space or place." *Id.* Under these restrictions, indoor and outdoor gatherings are limited to three households, but indoor gatherings are prohibited in Tier 1 and "strongly discouraged" in the remaining tiers. *Id.* The gatherings restrictions also limit gatherings in public parks or other outdoor spaces to three households. *Id.* A gathering must be in a space that is "large enough" to allow physical distancing of six feet, should be two hours or less in duration, and attendees must wear face coverings. *Id.* Finally, singing, chanting, shouting, cheering, and similar activities are allowed at outdoor gatherings with restrictions, but singing and chanting are not allowed at indoor gatherings. *Id.*

Appellants assert that the State's gatherings restrictions provide exemptions, which allow outdoor gatherings with social distancing, political protests and rallies, worship services, and cultural events such as weddings and funerals. Therefore, we also consider the restrictions that apply to these events. Under the State's restrictions, outdoor services with social distancing are allowed at houses of worship, such as churches, mosques, temples, and synagogues. *About COVID-19 Restrictions*, https://covid19.ca.gov/stay-home-except-for-essential-needs (under "Can I Go to Church" tab) (last visited Mar. 30, 2021). Indoor services at houses of worship are subject to capacity restrictions (25% of capacity in Tier 1 and 2 counties, and 50% of capacity in Tier 3 and 4 counties), and other safety modifications

3

including face coverings, COVID-19 prevention training, social distancing, cleaning and disinfection protocols, and restrictions on singing and chanting. *Id.*; *see also Industry Guidance to Reduce Risk*, https://covid19.ca.gov/industry-guidance#worship (under "Places of worship and cultural ceremonies—updated February 22, 2021" tab) (last visited Mar. 30, 2021).

The restrictions for houses of worship also apply to cultural ceremonies such as funerals and wedding ceremonies. *About COVID-19 Restrictions*, https://covid19.ca.gov/stay-home-except-for-essential-needs/ (under "Are weddings allowed?" tab) (last visited Mar. 30, 2021). However, wedding receptions are subject to the gatherings restrictions, so in Tier 1 receptions must take place outdoors and are limited to three households, while outdoor or indoor receptions, limited to three households, are allowed in the other tiers. *Id.*

"[S]tate public health directives do not prohibit in-person *outdoor* protests and rallies" with social distancing and face coverings. *Id.* (under "Can I engage in political rallies and protest gatherings?" tab) (emphasis in original). The terms "protests" and "rallies" are not defined,[2] but the guidance states that "Local Health Officers are advised to consider appropriate limitations on outdoor attendance capacities," and that failure to follow the social distancing restrictions and to wear

---

[2] One dictionary defines a "rally" as "a mass meeting intending to arouse group enthusiasm." *See Rally*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/rally (last visited Mar. 30, 2021).

face coverings "may result in an order to disperse or other enforcement action." *Id.* Indoor protests and rallies are not allowed in Tier 1 counties but are allowed in other counties subject to the capacity restrictions for places of worship, social distancing, face covering requirements, and prohibitions on singing and chanting. *Id.*

**B.**

Appellants challenge the restrictions on three grounds. First, Appellants Pastor Jeremy Wong and Karen Busch argue that the gatherings restrictions violate their right to free exercise of religion because they prevent them from holding in-home Bible studies and communal worship with more than three households in attendance. Second, Appellants Ritesh Tandon and Terry and Carolyn Gannon argue that the gatherings restrictions violate their First Amendment rights to freedom of speech and assembly. Tandon was a candidate for the United States Congress in 2020 and plans to run again in 2022, and he claims that the gatherings restrictions prevent him from holding in-person campaign events and fundraisers. The Gannons assert that the restrictions prohibit them from hosting forums on public affairs at their home. Finally, the business owner Appellants argue that the gatherings restriction, capacity limitations, and other regulations on their businesses violate their Fourteenth Amendment substantive due process and equal protection rights.

**C.**

In determining whether to grant an injunction pending appeal, we apply the

test for preliminary injunctions. *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 472 F.3d 1097, 1100 (9th Cir. 2006). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

## II.

## A.

We first address Appellants' free exercise claim. The district court denied Appellants' motion for a preliminary injunction because it concluded that California's private gatherings restrictions are neutral and generally applicable, and rationally related to a legitimate government interest. *Tandon v. Newsom*, No. 20-CV-07108-LHK, 2021 WL 411375, at *38 (N.D. Cal. Feb. 5, 2021). Alternatively, the district court concluded that the restrictions would satisfy strict scrutiny. *Id.* Appellants argue that the district court erred in applying rational basis review, that the restrictions do not meet the heightened standard of strict scrutiny, and that we should therefore issue an injunction pending appeal.[3]

---

[3] Appellants do not argue that the State's restrictions on gatherings would fail rational basis review. Under that deferential standard, regulations "must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller v. Doe*, 509 U.S. 312, 320 (1993) (quoting

Specifically, Appellants assert that the Supreme Court's decisions in *Gateway City Church v. Newsom*, __ S. Ct. __, 2021 WL 753575 (Feb. 26, 2021), *South Bay United Pentecostal Church* v. *Newsom*, 141 S. Ct. 716 (2021) (*South Bay II*), and *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam), establish that the restrictions at issue are not "neutral and generally applicable" and thus strict scrutiny applies.[4]  In these cases, the Court addressed free exercise

---

*F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).  In contrast, under strict scrutiny, the regulations "must be 'narrowly tailored' to serve a 'compelling' state interest." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) (quoting *Church of the Lukumi Babalu Aye, Inc., v. City of Hialeah*, 508 U.S. 520, 546 (1993)).

[4] The parties do not discuss, or even cite, the Supreme Court's recent decisions in *Harvest Rock Church v. Newsom*, ___ S. Ct. ___, No. 20A137, 2021 WL 406257 (Feb. 5, 2021) (per curiam), and *Harvest Rock Church v. Newsom*, 141 S. Ct. 889 (2020) (mem.).  In the first of these two decisions in the same case, without elaboration, the Court treated an application for injunctive relief as a petition for writ of certiorari before judgment and granted the petition, vacated the district court's judgment, and remanded to this court to remand to the district court for "further consideration in light of" *Roman Catholic Diocese*.  141 S. Ct. 889.

In the second decision, the Court considered the same prohibitions on indoor services at house of worship that were at issue in *Gateway,* 2021 WL 3086060, at *4, and *South Bay II*, 141 S. Ct. at 716, and granted an application for injunctive relief pending appeal and enjoined the State from enforcing the Tier 1 prohibition on indoor worship services but denied the application with respect to the percentage capacity limitations and the singing and chanting restrictions during indoor services. 2021 WL 406257 at *1.  While some Justices noted that they would have granted the application for injunctive relief in full and other Justices noted that they dissented, those Justices only referenced their statements in *South Bay II*.  *See id.* Thus, *Harvest Rock* does not substantively add to the body of case law informing our analysis, as our dissenting colleague apparently agrees.  *See* Dissent at 7 (noting that "*Roman Catholic Diocese, South Bay* [*II*], and *Gateway City Church* instruct us").

challenges to COVID-19-based capacity limitations at public places of worship that were more prohibitive than capacity limitations at comparable businesses. *See Gateway*, __ S. Ct. __, 2021 WL 753575; *South Bay II*, 141 S. Ct. 716; *Roman Catholic Diocese*, 141 S. Ct. 63.

Appellants further argue that the State's current restrictions on in-home or private religious gatherings fail strict scrutiny because they do not apply to "a host of comparable secular activities," such as entering crowded train stations, airports, malls, salons, and retail stores, waiting in long check-out lines, and riding on buses. Thus, Appellants argue that the State's gatherings restriction is underinclusive because it does not "include in its prohibition substantial, comparable secular conduct that would similarly threaten the government's interest." *Stormans, Inc., v. Wiesman*, 794 F.3d 1064, 1079 (9th Cir. 2015).

But as we explain below, from our review of these recent Supreme Court decisions, we conclude that Appellants are making the wrong comparison because the record does not support that private religious gatherings in homes are comparable—in terms of risk to public health or reasonable safety measures to address that risk—to commercial activities, or even to religious activities, in public buildings. When compared to analogous secular in-home private gatherings, the State's restrictions on in-home private religious gatherings are neutral and generally applicable and, thus, subject to rational basis review. *See Church of the Lukumi*

*Babalu Aye, Inc., v. City of Hialeah*, 508 U.S. 520, 531 (1993) (holding that "a law that is neutral and of general applicability . . . even if the law has the incidental effect of burdening a particular religious practice" must only survive rational basis review). Therefore, we conclude that Appellants have not established a likelihood of success on the merits. *See Winter*, 555 U.S. at 20.

**B.**

As Appellants argue, three recent Supreme Court decisions addressing free exercise challenges to COVID-19 restrictions are relevant to our analysis. First, in *Roman Catholic Diocese*, the Court held that New York's COVID-19 restrictions triggered strict scrutiny because "[t]he applicants . . . made a strong showing that the challenged restrictions violate 'the minimum requirement of neutrality' to religion." 141 S. Ct. at 66 (quoting *Lukumi*, 508 U.S. at 533). The Court wrote that "the regulations cannot be viewed as neutral because they single out houses of worship for especially harsh treatment." *Id.*

As proof of this "especially harsh treatment," the Court pointed out that "while a synagogue or church may not admit more than 10 persons, businesses categorized as 'essential' may admit as many people as they wish," and that those "essential businesses" included "acupuncture facilities, camp grounds, garages, as well as . . . all plants manufacturing chemicals and microelectronics and all transportation facilities." *Id.*; *see also id.* at 69 (Gorsuch, J., concurring) ("People may gather

9

inside for extended periods in bus stations and airports, in laundromats and banks, in hardware stores and liquor shops. No apparent reason exists why people may not gather, subject to identical restrictions, in churches or synagogues . . . ."). Because "a large store in Brooklyn . . . could 'literally have hundreds of people shopping there on any given day,'" but "a nearby church or synagogue would be prohibited from allowing more than 10 or 25 people inside for a worship service," the restrictions were not neutral or generally applicable. *Id.* at 67 (citation omitted). The Court further held that the restrictions did not pass strict scrutiny. *Id.*

Then, in *South Bay II*, the Court reviewed California's Tier 1 restrictions, which included a total "prohibition on indoor worship services," and enjoined enforcement of this restriction. 141 S. Ct. at 716. Justice Gorsuch, joined by Justices Thomas and Alito, and with whom Justices Kavanaugh and Barrett agreed,[5] wrote:

> California has openly imposed more stringent regulations on religious institutions than on many businesses. The State's spreadsheet summarizing its pandemic rules even assigns places of worship their own row. [For the Tier 1 regulations] applicable [at that time] in most of the State, California forbids any kind of indoor worship. Meanwhile, the State allows most retail operations to proceed indoors with 25% occupancy, and other businesses operate at 50% occupancy or more. Apparently, California is the only State in the country that has gone so far to ban *all* indoor religious services.

---

[5] Justice Barrett did not join Justice Gorsuch's statement, but she "agree[d] with [that] statement, save" one issue not relevant to this appeal. *South Bay II*, 141 S. Ct. at 717 (Barrett, J., joined by Kavanaugh, J., concurring in the partial grant of application for injunctive relief).

*Id.* at 717 (Statement of Gorsuch, J.) (citations omitted). Justice Gorsuch also compared indoor religious services to the "scores [that] might pack into train stations or wait in long checkout lines in the businesses the State allows to remain open." *Id.* at 718. And he questioned California's arguments about close physical proximity, even as it allowed certain businesses to permit closer physical interactions. *Id.* at 718–19.

Finally, the Court addressed Santa Clara County's restrictions in *Gateway*, __ S. Ct. __, 2021 WL 753575. Santa Clara County had enacted a restriction that "[p]rohibited" all indoor gatherings. As examples, Santa Clara County listed "political events, weddings, funerals, worship services, movie showings, [and] cardroom operations." But the county imposed different restrictions for "a number of businesses and activity types, including retail stores," which were allowed to operate at 20% capacity indoors. *Gateway City Church v. Newsom*, No. 20-08241, 2021 WL 308606, at *4 (N.D. Cal. Jan. 29, 2021). Our court affirmed the district court's ruling and held that this regulation, which restricted indoor gatherings in "places of worship," "applie[d] equally to all indoor gatherings of any kind or type, whether public or private, religious or secular" because it did "not 'single out houses of worship' for worse treatment than secular activities." *Gateway City Church v. Newsom*, 2021 WL 781981, at *1 (9th Cir. Feb. 12, 2021) (quoting *Roman Catholic Diocese*, 141 S. Ct. at 66). The Court rejected this reasoning, stating: "The Ninth

11

Circuit's failure to grant relief was erroneous. This outcome is clearly dictated by [the] Court's decision in" *South Bay II*. *Gateway*, 2021 WL 753575, at *1.

## C.

Reviewing this precedent, we conclude that the regulations at issue in *Gateway* and *South Bay II*, which applied total bans on indoor services at houses of worship, differ significantly from those at issue in this case. The gatherings restrictions at issue here do not impose a total ban on all indoor religious services, but instead limit private indoor and outdoor gatherings to three households. There is no indication that the State is applying the restrictions to in-home private religious gatherings any differently than to in-home private secular gatherings.

"[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Lukumi*, 508 U.S. at 533. But here, the gatherings restrictions apply equally to private religious and private secular gatherings, and there is no indication, or claim, of animus toward religious gatherings. The restrictions do not list examples of prohibited gatherings or single out religious gatherings. *See Blueprint for a Safer Economy*, https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Dimmer-Framework-September_2020.pdf (last visited Mar. 30, 2021). Thus, the gatherings restrictions are neutral on their face. *See Lukumi*, 508 U.S. at 533 (holding that for a law that burdens religious practice to be neutral, it must at

least be neutral on its face).

However, "[f]acial neutrality is not determinative." *Id.* at 534.[6] Instead, we must also "survey meticulously the circumstances of governmental categories" to determine whether there are "subtle departures from neutrality" or "religious gerrymander[ing]," which could indicate that the object of the law is to restrict religious practices. *Id.* (citations and internal quotation marks omitted). Here, Appellants have not asserted that the object of the gatherings restrictions is to restrict religious practices, and there is no indication that the restrictions were adopted for discriminatory purposes instead of addressing public health concerns.

Accordingly, we must consider whether the regulations nonetheless "treat[] religious observers unequally," and thus are not laws of general applicability. *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1235 (9th Cir. 2020). One way to assess whether a law is selectively applicable is to determine whether the law's restrictions "substantially underinclude non-religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect." *Stormans*, 794

---

[6] Thus, we agree with our dissenting colleague that "the fact that a restriction is *itself* phrased without reference to religion is not dispositive." Dissent at 6. However, we note that, unlike in *South Bay II*, where California's "spreadsheet summarizing its pandemic rules even assign[ed] places of worship their own row," 141 S. Ct. at 717 (Statement of Gorsuch, J.), the gatherings restrictions here never mention religion. *See also Agudath Israel of Am. v. Cuomo*, 979 F.3d 177, 182 (2d Cir. 2020) (Park, J., dissenting) ("In each zone, the order subjects only 'houses of worship' to special 'capacity limit[s].'").

13

F.3d at 1079 (citing *Lukumi*, 508 U.S. at 542–46). "In other words, if a law pursues the government's interest 'only against conduct motivated by religious belief' but fails to include in its prohibitions substantial, comparable secular conduct that would similarly threaten the government's interest, then the law is not generally applicable." *Id.* (quoting *Lukumi*, 508 U.S. at 545).

Appellants argue that pursuant to the reasoning of *Roman Catholic Diocese*, *South Bay II*, and *Gateway*, the gatherings restrictions at issue in this case are underinclusive because the State applies different restrictions to commercial activity in public buildings. Appellants compare the restrictions on private gatherings to the restrictions on commercial activities in public buildings, such as train stations, malls, salons, and airports. But in *Roman Catholic Diocese*, *South Bay II*, and *Gateway*, the Court did not make similar comparisons. Instead, in each case in which the Supreme Court compared religious activity to commercial activity, it did so in the context of comparing public-facing houses of worship to public-facing businesses.[7]

---

[7] The dissent argues that "when California allows greater freedoms for some sectors, it may not leave religious activities behind" and that "the suppression of *some* comparable secular activity in a similar fashion to religious activity is not dispositive." Dissent at 12, 17–18 (citing *Roman Catholic Diocese*, 141 S. Ct. at 73 (Kavanagh, J., concurring). Although Justice Kavanaugh's concurrence in *Roman Catholic Diocese* is not the controlling opinion, the dissent mischaracterizes that opinion. Justice Kavanaugh wrote that "under [the Supreme] Court's precedents, it does not suffice for a State to point out that, as compared to *houses of worship*, *some secular businesses* are subject to similarly severe or even more severe restrictions." *Roman Catholic Diocese*, 141 S. Ct. at 73 (Kavanaugh, J., concurring) (some

14

Because we identify the comparison applied in these cases—houses of worship compared to secular businesses—our dissenting colleague suggests that we are holding that First Amendment free exercise rights apply only in houses of worship. Dissent at 15. He misses the point. We note that in these cases the Supreme Court addressed restrictions on houses of worship—not because we are suggesting that the Constitution's protections for the free exercise of religion apply only in houses of worship—but rather because the Court's precedent directs us to compare restrictions on religious activities to restrictions on "analogous" secular activities. *See Lukumi*, 508 U.S. at 546. In its recent decisions, the Supreme Court held that restrictions subjected worship services to disparate treatment because the settings at issue were similar and subject to meaningful comparisons—houses of worship such as churches, mosques, synagogues, and temples compared to public buildings for commercial activities such as stores, malls, and other businesses.

The dissent's argument that "businesses are analogous comparators to religious practice in the pandemic context," Dissent at 6, oversimplifies the issue here. Although the Supreme Court has compared regulation of religious activities to regulation of business activities under comparable circumstances, it has never framed its analysis in the general terms of "religious practice" and

emphasis added). Thus, Justice Kavanaugh, in line with the controlling opinions and orders in *Roman Catholic Diocese*, *South Bay II*, and *Gateway*, compared businesses only to houses of worship, not to all religious activities.

"businesses." Rather, it has focused on the circumstances surrounding the regulated religious activities to determine whether those particular classes of religious activity were being treated less favorably than comparable classes of secular activity. Thus, it was essential in the recent Supreme Court decisions that the regulations in question implicated religious activity *in houses of worship*. *See South Bay*, 141 S. Ct. at 717 (Roberts, C.J., concurring) ("[T]he State's present determination—that the maximum number of adherents who can safely worship in the most cavernous cathedral is zero—appears to reflect not expertise or discretion, but instead insufficient appreciation or consideration of the interests at stake."); *Roman Catholic Diocese*, 141 S. Ct. at 67 (analyzing regulations that "single out houses of worship for especially harsh treatment" and noting that "the maximum attendance at a religious service could be tied to the size of the church or synagogue").

Moreover, when the Court granted injunctive relief as to gathering restrictions in *South Bay* and *Harvest Rock*, it did not issue a blanket injunction covering all state regulation of "religious practice." Instead, it distinguished between restrictions on operating houses of worship—which were impermissible under the circumstances— and capacity limitations and restrictions on "indoor singing and chanting," which it declined to enjoin because the plaintiffs had not carried their burden (at least at that stage of the proceedings) of showing "that the State is not applying the . . . prohibition . . . in a generally applicable manner." *Harvest Rock Church v.*

16

*Newsom*, No. 20A137, __ S. Ct. __, 2021 WL 406257, at *1 (Feb. 5, 2021); *South Bay*, 141 S. Ct. at 716 ("This order is without prejudice to the appellants presenting new evidence to the District Court that the State is not applying the percentage capacity limitations or the prohibition on singing and chanting in a generally applicable manner.").

By taking this approach, we absolutely do not "confine religious freedom to 'free exercise zones,'" Dissent at 15, as the dissent suggests. We simply recognize that the Supreme Court's free exercise analysis—which first requires determining which tier of scrutiny to apply—fundamentally turns on whether a state *discriminates* against religious practice. In turn, to determine whether a state discriminates, the Supreme Court instructs us to compare "*analogous* non-religious conduct," *Lukumi*, 508 U.S. at 546 (emphasis added), not to compare *all* non-religious conduct. *See also Roman Catholic Diocese*, 141 S. Ct. at 69 (Gorsuch, J., concurring) (noting that the First "Amendment prohibits government officials from treating religious exercises worse than *comparable* secular activities, unless they are pursuing a compelling interest and using the least restrictive means available." (emphasis added)); *Stormans*, 794 F.3d at 1079 (describing how *Lukumi* requires analyzing "prohibitions on substantial, *comparable* secular conduct that would similarly threaten the government's interest" (emphasis added)).

An analogy requires "[a] corresponding similarity or likeness." *Analogy*,

BLACK'S LAW DICTIONARY (11th ed. 2019). Thus, we cannot answer the question of whether the state discriminates without first framing the correct comparison. And not every activity is analogous to every other activity. That would empty all meaning from the word "analogy." Unsurprisingly, then, this analysis depends on the type, location, and circumstances of the regulated activities.

Here, Appellants' underinclusivity argument relies on a comparison of gatherings in private homes to commercial activity in public buildings, and in particular they point to commercial activity in large buildings such as train stations, airports, and shopping malls.[8] But nothing in the record supports Appellants' suggestions that these commercial activities are proper comparators to in-home private religious gatherings. Instead, it appears Appellants are arguing that we should reach the conclusion the Supreme Court rejected when it did not enjoin capacity limitations and singing restrictions in houses of worship: that any restrictions that have an incidental effect on religious conduct can be appropriately compared to restrictions on any secular conduct.

Based on the record, the district court concluded that the State reasonably distinguishes in-home private gatherings from the commercial activity Appellants

---

[8] Appellants also mention salons in a laundry list of indoor commercial activities that are not limited to three households. But Appellants do not explain why salons should be considered analogous secular conduct and they point to nothing in the record to support that comparison.

18

assert is comparable. For example, the district court found that the State reasonably concluded that when people gather in social settings, their interactions are likely to be longer than they would be in a commercial setting; that participants in a social gathering are more likely to be involved in prolonged conversations; that private houses are typically smaller and less ventilated than commercial establishments; and that social distancing and mask-wearing are less likely in private settings and enforcement is more difficult. *Tandon*, 2021 WL 411375, at *30. Appellants do not dispute any of these findings. Therefore, we conclude that Appellants have not established that strict scrutiny applies to the gatherings restrictions. Appellants do not contend that the State's restrictions fail rational basis review, and we agree with the district court that the capacity restrictions likely meet that low bar. *See id.* at *40. Therefore, Appellants have not shown a likelihood of success on the merits of the free exercise claim.

### D.

Our dissenting colleague apparently agrees with Appellants' argument that broadly compares private religious gatherings to secular or commercial activity, although unlike Appellants he focuses on the comparison to small businesses, such as barbershops and tattoo parlors. These small businesses are not subject to the three-household restriction for private gatherings or the capacity restrictions that apply to other businesses and to houses of worship. *See* Cal. Dep't of Pub. Health,

*Blueprint for a Safer Economy*, https://covid19.ca.gov/safer-economy/#tier-assignments (last visited Mar. 30, 2021).

Nonetheless, the State requires that these small businesses implement extensive safety protocols, explained in a fourteen-page, single-spaced document, which incorporates the *Guidance on Face Coverings* and therefore "requires the use of face coverings for both members of the public and workers in all public and workplace settings." *See COVID-19 Industry Guidance: Expanded Personal Care Services*, at 3 (Oct. 20, 2020), https://files.covid19.ca.gov/pdf/guidance-expanded-personal-care-services--en.pdf. Among other things, the *Industry Guidance* also requires that such businesses:

- "Establish a written workplace-specific COVID-19 prevention plan," train workers on that plan and COVID-19 safety in general, and "[r]egularly evaluate the workplace for compliance with the plan."

- "Provide temperature and/or symptom screenings for all workers at the beginning of their shifts."

- "Contact customers before visits to confirm appointments and ask if they or someone in their household is exhibiting any COVID-19 symptoms."

- "Tell customers that no additional friends or family will be permitted in the facility, except for a parent or guardian accompanying a minor."

- "Use hospital grade, Environmental Protection Agency (EPA)-approved products to clean and disinfect anything the client came in contact with."

- "Implement measures to ensure physical distancing of at least six feet between and among workers and customers, except while providing the services that require close contact."

- "Maintain at least six feet of physical distance between each work station area, and/or use impermeable barriers between work stations to protect customers from each other and workers."

- Require that "workers who consistently must be within six feet of customers or co-workers must wear a secondary barrier (e.g., face shield or safety goggles) in addition to a face covering."

- "Stagger appointments to reduce reception congestion and ensure adequate time for proper cleaning and disinfection between each customer visit."

- "Ask customers to wait outside or in their cars . . . [r]eception areas should only have one customer at a time."

*Id.* at 4–10. These businesses are also subject to ventilation, cleaning, and disinfecting protocols. *Id.* at 7–9. The *Industry Guidance* also provides additional restrictions for specific services such as esthetic and skin care services, electrology services, nail services, massage services, and restrictions for body art professionals, tattoo parlors, and piercing shops. *Id.* at 11–14. These restrictions, for example, "suspend piercing and tattooing services for the mouth/nose area," allow "tattooing or piercing services for only one customer at a time," and state that "[f]acial massages should not be performed if it requires removal of the client's face

21

covering." *Id.* at 14.[9]

These restrictions for businesses that provide personal care services establish that there is very little basis for comparing these businesses to private in-home religious gatherings. For example, they refer extensively to policies these businesses should adopt regarding "customers," "appointments," and "workers," which do not appear to translate readily to in-home gatherings. Also, ensuring public-facing businesses comply with these regulations is a fundamentally different task from regulating conduct in private homes, which government authorities cannot simply enter at will. *See, e.g.*, *Florida v. Jardines*, 569 U.S. 1, 6 (2013) ("At the [Fourth] Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." (quotation marks and citation omitted)). Thus, it appears that "personal care services" are not analogous secular businesses or appropriate comparators to private in-home religious gatherings.

Significantly, we do not ground our conclusion on any speculation outside the

---

[9] The dissent repeatedly emphasizes tattoo parlors, *see* Dissent at 9, 10, 14, 17, 21, which might provide a useful rhetorical foil for in-home Bible studies, but the parties do not cite tattoo parlors as a point of comparison for in-home religious activities. Our dissenting colleague's implication is that tattoo parlors are subject to less onerous restrictions than in-home Bible study (apparently based on his opinion that a three-household limit is more onerous than the detailed restrictions that apply to businesses that provide personal care services) and that they significantly contribute to the spread of COVID-19 in California (or else they would not be relevant comparators to in-home religious gatherings).

22

record about the circumstances in which "personal care services" typically take place. The dissent, in contrast, does make such speculations about personal care services. *See* Dissent at 8–10. We remind our colleague, however, that *Appellants* bear the burden of showing a likelihood of success on the merits to justify an injunction pending appeal. To do so on the basis that the regulation fails under strict scrutiny, they (not the State) bear the further burden of showing that the regulation *triggers* strict scrutiny by regulating religious activities more strictly than comparable secular activities. *See Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014) (explaining that for a preliminary injunction "in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are being threatened with infringement, at which point the burden shifts to the government to justify the restriction." (citation omitted)). They have failed to make that showing here.[10]

**E.**

Our dissenting colleague also argues that the gatherings restrictions are not neutral because they favor certain political activities, specifically outdoor rallies and

---

[10] Additionally, our dissenting colleague appears to conflate the two steps of the free exercise analysis when he argues that California's regulation of these businesses "is a sure sign that narrower tailoring is possible for in-home religious practice." Dissent at 18. We need not, and do not, analyze whether California's gatherings restriction is narrowly tailored because we conclude that it does not disfavor religious practice and therefore does not trigger strict scrutiny.

protests, over outdoor religious activities. Dissent at 10–11. However, he recognizes that outdoor religious activities are allowed at houses of worship and are not limited to three households. *See About COVID-19 Restrictions*, https://covid19.ca.gov/stay-home-except-for-essential-needs (under "Can I go to church?" tab) (last visited Mar. 30, 2021). Also, indoor rallies and protests are subject to the same restrictions as public indoor religious gatherings at houses of worship. *Id.* (under "Can I engage in political rallies and protest gatherings?" tab) (explicitly applying the restrictions for indoor services at houses of worship to indoor rallies and protests). Therefore, in arguing that outdoor religious and secular activities in private homes are treated differently, it appears that the dissent assumes that outdoor "rallies" and "protests" are allowed in backyards of private homes. Dissent at 10–11. But this is not at all clear from the plain language of the restrictions, which fail to define "rallies" and "protests" and do not clearly delineate where these events are allowed, and so the dissent's argument necessarily depends on assumptions and speculation.

If we were to apply the dictionary definition of "rally," we could conclude that outdoor "rallies" and "protests" refer to mass public gatherings, typically organized outside government buildings, not private gatherings in backyards. *See Rally*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/rally (last visited Mar. 30, 2021). Moreover, other language in the restrictions suggests

24

that rallies and protests are public political events that are treated the same as public religious activities. For example, indoor public religious activities and indoor rallies and protests are subject to the same capacity, face covering, and other safety restrictions. *See About COVID-19 Restrictions*, https://covid19.ca.gov/stay-home-except-for-essential-needs/ (under "Can I engage in political rallies and protest gatherings?" tab) (last visited Mar. 30, 2021). In addressing rallies and protests, the State encourages "Local Health Officers" to consider outdoor attendance capacities, which appears to refer to capacities in public locations, not backyards. *See id.* The restrictions also state that participants at rallies and protests "must maintain a physical distance of at least 6 feet from any uniformed peace officers." *Id.* While it is perhaps conceivable that uniformed peace officers would be at rallies and protests in private backyards, this restriction certainly suggests the State is addressing outdoor rallies and protests in public locations. Finally, the restrictions encourage those for whom "collective action in physical space is important" to consider participating in protests from their cars. *Id.* (under "I want to express my political views. How can I make my voice heard without raising public health concerns?" tab). Again, this suggests that rallies and protests would occur in public spaces that can accommodate participation from cars, which would seem to exclude the backyards of most private homes.

But again, we need not, and do not, rely on speculation outside the record to

determine whether Appellants have shown that rallies and protests are comparable secular activities. Rather, we decline to grant the "drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), of emergency injunctive relief on the speculative grounds raised by our dissenting colleague because Appellants have failed to carry their burden on these issues. *See Winter*, 555 U.S. at 22 ("[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").

Even as we deny Appellants' motion for an injunction pending appeal, we do so without prejudice to the possibility that a plaintiff could conceivably prevail based on the political activities argument that the dissent makes—assuming, of course, that plaintiff could make the necessary factual showings in support of those arguments. But because *these* plaintiffs have not made this argument, and the State has had no reason or opportunity to respond to them, we decline to express an opinion on them now, let alone rely on them to grant the extraordinary remedy of an injunction pending appeal.[11]

*     *     *

We believe the best interpretation of *Roman Catholic Diocese*, *South Bay II*,

---

[11] Although our dissenting colleague writes that we "appear[] to share [his] concerns regarding California's exemption for political rallies and protests, but not for religious activity," Dissent at 19, we expressly make no ruling pertaining to the substance of that argument.

26

and *Gateway* is that rational basis review should apply to the State's gatherings restrictions because in-home secular and religious gatherings are treated the same, and because Appellants' underinclusivity argument fails as they have not provided any support for the conclusion that private gatherings are comparable to commercial activities in public venues in terms of threats to public health or the safety measures that reasonably may be implemented. Thus, Appellants have not shown that gatherings in private homes and public businesses "similarly threaten the government's interest," and therefore they have not shown that strict scrutiny applies.

Even if our dissenting colleague's interpretation of the Supreme Court's precedent is plausible, that is not enough for Appellants to succeed at this stage of the litigation. When a party asks for an emergency injunction pending appeal, we ask whether that party "is *likely* to succeed on the merits." *Winter*, 555 U.S. at 20 (emphasis added). The facts before us and the Supreme Court's current case law do not support the outcome advocated by our dissenting colleague. Thus, it is inappropriate to issue an injunction based on Appellants' free exercise claims at this time.[12]

---

[12] Because the first *Winter* factor is dispositive of Appellants' emergency motion, we need not address the other factors. *See California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) ("Likelihood of success on the merits is 'the most important' factor; if a movant fails to meet this 'threshold inquiry,' we need not consider the other factors." (citation omitted)).

## III.

We also deny as unnecessary Appellants' request for an injunction on their free speech and assembly claims. Tandon seeks to host political activities such as debates, fundraisers, and meet-the-candidate events, while the Gannons wish to hold small-group political discussions. The district court concluded, without explanation, that "the State's private gatherings restrictions do not apply to the political campaign events Tandon wishes to hold." *Tandon*, 2021 WL 411375, at \*25. Earlier, in its summary of the various restrictions at issue, the district court stated that "the State permits unlimited attendance at . . . outdoor political events." *Id.* at \*15. The district court also stated that Tandon challenged Santa Clara County's restrictions, while the Gannons challenged the State's restrictions. *Id.* at 13. But the district court did not explain why the State's restrictions would apply to the Gannons but not Tandon, and did not explain how, or if, any of these political gatherings would be considered rallies or protests.

On appeal, the State does not challenge the district court's ruling. And Appellants seem to assume that the gatherings restrictions prohibit all political gatherings at issue here, except Tandon's campaign rallies. The parties do not define "rallies," or explain when or where such events are permitted, or whether any restrictions or safety protocols apply to these events. Nonetheless, based on the district court's ruling, the State's gatherings restrictions do not apply to Tandon's

28

requested political activities, and given the State's failure to define rallies or distinguish Tandon's political activities from the Gannons' political activities, we conclude that, on the record before us, the State's restrictions do not apply to the Gannons' political activities. Therefore, Appellants have not established that an injunction is necessary, and we deny as moot the emergency motion for injunctive relief on these claims.[13]

### IV.

Finally, we conclude that the business owner Appellants have not established a likelihood of success on their challenge. We have "never held that the right to pursue work is a fundamental right," and, as such, the district court likely did not err in applying rational basis review to their due process claims. *See Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir. 2004); *Tandon*, 2021 WL 411375, at \*16–19. Likewise, business owners are not a suspect class, and the district court correctly applied rational basis review to their equal protection claims. *See Williamson v. Lee Optical*, 348 U.S. 483, 489, 491 (1955); *Tandon*, 2021 WL 411375, at \*19–25.

### V.

Appellants have not demonstrated a likelihood of success on the merits for

---

[13] This denial is without prejudice to a party asserting in subsequent proceedings that either Tandon's or the Gannons' motion for an injunction is not mooted by the district court's ruling limiting the scope of California's gatherings restriction.

their free exercise, due process, or equal protection claims, nor have they demonstrated that injunctive relief is necessary for their free speech claims. Therefore, we deny the emergency motion for an injunction pending appeal.

**DENIED.**

*Ritesh Tandon v. Gavin Newsom*, No. 21-15228
BUMATAY, J., Circuit Judge, dissenting in part and concurring in part:

In this uncertain time, only a few things are clear:

First, courts are not competent to respond to the COVID-19 crisis. California, like other States, is charged with the authority and the responsibility of guiding her people through this pandemic. And courts shouldn't engage in unnecessary second-guessing or hindsight quarterbacking when it comes to matters of health and safety.

Second, and most foundational, the Constitution is enduring. The rights enshrined by the Constitution persist in times of crisis and tranquility. Thus, at all times, courts must fulfill their duty to ensure that constitutional rights are protected.

Equally certain are the Supreme Court's instructions for navigating the intersection of these two principles. While States possess the discretion to respond to the pandemic, we can never abdicate our role as the bulwark against constitutional violations. In adjudicating challenges to COVID-19 restrictions, we must recognize that the right to the free exercise of religion guaranteed by the First Amendment is among our most fundamental freedoms. No State, in implementing a COVID-19 response, can arbitrarily discriminate against the exercise of religion.

Three times before, the Supreme Court has found that our court failed to strike the proper balance between these principles. Unfortunately, we make the same mistake here. California currently bans all indoor and outdoor gatherings at home

1

with more than three households.  Pastor Jeremy Wong and Karen Busch seek to enjoin that restriction to allow them to host Bible studies and communal worship in their homes without the three-household limitation.  By failing to grant their requested injunction, we disregard the lessons from the Court and turn a blind eye to discrimination against religious practice.

I agree with the majority that (1) an injunction is unnecessary on Appellants' free speech and assembly claims since California's gatherings restrictions do not apply to their political activities, and (2) Appellants have not demonstrated that the State's commercial restrictions violate due process or equal protection.  But I would hold that California has clearly infringed on Wong and Busch's free exercise rights.  Accordingly, I would grant their requested injunction pending appeal of their religious freedom claim.  For this reason, I respectfully dissent.

**I.**

The Free Exercise Clause forbids the government from subjecting religious activity to "unequal treatment."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993) (simplified).  To that end, a law that burdens religious practice must be both neutral and generally applicable.  *Id.* at 546.  Otherwise, it must be subjected to "the most rigorous of scrutiny."  *Id.*  Restrictions are not generally applicable if they burden religious activity more than "analogous" secular conduct.  *Id.*

2

When it comes to Free Exercise challenges to COVID-19 restrictions, we are no longer writing on a blank slate. Just last month, the Supreme Court corrected us in *three* separate cases—each time enjoining portions of California's emergency restrictions on Free Exercise grounds. *See S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) (*South Bay*); *Harvest Rock Church v. Newsom*, No. 20A137, __ S. Ct. __, 2021 WL 406257 (Feb. 5, 2021); *Gateway City Church v. Newsom*, No. 20A138, __ S. Ct. __, 2021 WL 753575 (Feb. 26, 2021). Even before then, the Court provided significant direction on how to evaluate COVID-19 limitations on religious exercise. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam). Cumulatively, the message has been clear: States may not disfavor religious activity in responding to the pandemic.

Our first lesson was in *Roman Catholic Diocese of Brooklyn*, when the Court enjoined a New York executive order that limited attendance at religious services to 10 or 25 people, depending on whether the service took place in a "red" or "orange" zone. *Id.* at 65–66. The Court explained that the restriction effected "disparate treatment" because analogous businesses—including acupuncture facilities, campgrounds, garages, and retail stores—were not subject to capacity limits. *Id.* at 66. It therefore applied strict scrutiny and concluded that the order was not narrowly tailored. *Id.* at 67. Justice Kavanaugh further explained that it did not matter that "*some* secular businesses are subject to similarly severe or even more severe

3

restrictions." *Id.* at 73 (Kavanaugh, J., concurring) (emphasis original). When restrictions create a "favored class" of businesses, the State must justify excluding houses of worship from that class. *Id.*

After *Roman Catholic Diocese* came *Harvest Rock Church*. That case required two interventions by the Supreme Court. On the first trip up to the Court, we had declined to enjoin California's *total* prohibition on indoor worship services in Tier 1—the most severe level of COVID-19 restrictions. *Harvest Rock Church, Inc. v. Newsom*, 977 F.3d 728, 730–31 (9th Cir. 2020) (*Harvest Rock II*). The Supreme Court gave us a second chance, vacating that order and remanding in light of *Roman Catholic Diocese*. No. 20A94, __ S. Ct. __, 2020 WL 7061630 (Dec. 3, 2020) (*Harvest Rock III*). On the second trip to the Court, we *again* denied relief in a largely unreasoned decision. 985 F.3d 771 (9th Cir. 2021) (*Harvest Rock IV*). The Court once more stepped in and enjoined the prohibition. *Harvest Rock Church*, 2021 WL 406257, at *1.

Our court seemed to take the hint in *South Bay*, which challenged the same ban on indoor religious services as in *Harvest Rock Church*. When the district court denied injunctive relief, we vacated and remanded in light of *Roman Catholic Diocese* and *Harvest Rock Church*. *S. Bay United Pentecostal Church v. Newsom*, 981 F.3d 765 (9th Cir. 2020) (*South Bay II*). But when the district court again denied relief, we simply affirmed, reaching the astounding conclusion that the total ban

4

satisfied strict scrutiny. *S. Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1146–48 (9th Cir. 2021) (*South Bay III*). This time, the Court responded decisively.

Justice Gorsuch, joined in relevant part by four other members of the Court, explained that California's total ban on indoor religious services "single[d] out religion for worse treatment than many secular activities," triggering strict scrutiny. *South Bay*, 141 S. Ct. at 719 (statement of Gorsuch, J.). And the Court had already "made it abundantly clear that edicts like California's fail strict scrutiny and violate the Constitution." *Id*. (citing *Roman Catholic Diocese*, 141 S. Ct. 63). Specifically, the State failed to show that less-restrictive alternatives, like those afforded to secular activities, were insufficient to address COVID-19 concerns. *Id*. at 718–19. The Court's order, therefore, "should have been needless" because of the "extensive guidance" made available to lower courts. *Id.* But our failure to apply *Roman Catholic Diocese* compelled the Court itself to enjoin the ban.

Finally came *Gateway City Church*. There, Santa Clara County's order restricted religious activity by shuttering indoor "[g]atherings (e.g., political events, weddings, funerals, worship services, movie showings, cardroom operations)." *Gateway City Church v. Newsom*, No. 20-cv-8241, 2021 WL 308606, at *4 (N.D. Cal. Jan 29, 2021) (*Gateway City Church II*). As here, exceptions were made for certain favored activities but not worship services. *Id* at *10. Nevertheless, we

denied an injunction pending appeal simply because the County's order restricted "gatherings" without specific reference to religion. No. 21-15189, 2021 WL 781981, at *1 (9th Cir. Feb. 12, 2021) (*Gateway City Church III*). In our view, that made the order neutral and generally applicable. *Id.* The plaintiffs appealed to the Supreme Court, and you can guess the rest: it granted the injunction in a one-paragraph opinion, tersely faulting our court for *again* failing to apply its precedents. *Gateway City Church*, 2021 WL 753575, at *1. Once again, we should have recognized that the Court's prior decisions "clearly dictated" enjoining the restriction. *Id.* At this point, a tale as old as time.

The instructions provided by the Court are clear and, by now, redundant. First, regulations must place religious activities on par with the most favored class of comparable secular activities, or face strict scrutiny. *Roman Catholic Diocese*, 141 S. Ct. at 66–67. States do not satisfy the Free Exercise Clause merely by permitting some secular businesses to languish in disfavored status alongside religious activity. *Id.* Second, the fact that a restriction is *itself* phrased without reference to religion is not dispositive. *See Gateway City Church*, 2021 WL 753575, at *1. So long as some comparable secular activities are less burdened than religious activity, strict scrutiny applies. Third, businesses are analogous comparators to religious practice in the pandemic context. *Roman Catholic Diocese*, 141 S. Ct. at 67.

6

## II.

Pastor Jeremy Wong and Karen Busch each seek an injunction of the California restriction preventing them from hosting Bible studies and communal worship services with more than three total households of fellow worshippers. To succeed, they must establish (1) a strong likelihood of success on the merits, (2) a possibility of irreparable injury if relief is not granted, (3) a balance of hardships in their favor, and (4) advancement of the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Likelihood of success on the merits is the most important preliminary injunction factor. *Doe #1 v. Trump*, 984 F.3d 848, 861 (9th Cir. 2020). Furthermore, because the government is a party to the case, the third and fourth factors merge. *Id.*

### A.

Based on the legal background above, California's gatherings restriction as applied to in-home worship and Bible study is subject to strict scrutiny, and the State has not sustained its burden to prove the household limitations are narrowly tailored. Consequently, Wong and Busch have shown a clear likelihood of success on the merits, and the first *Winter* factor tips strongly in favor of granting the injunction.

### 1.

As *Roman Catholic Diocese, South Bay,* and *Gateway City Church* instruct us, we must apply strict scrutiny to any restriction that disparately impacts religious

7

practice compared to analogous secular conduct. For purposes of this comparison, "[w]hether conduct is analogous . . . does not depend on whether the religious and secular conduct involve similar forms of activity[,]" but is instead "measured against the *interests* the State offers in support of its restrictions on conduct." *Monclova Christian Acad. v. Toledo-Lucas Cnty. Health Dep't*, 984 F.3d 477, 480 (6th Cir. 2020) (applying *Roman Catholic Diocese* to a regulation on all schools given its impact on religious schools).

Here, the State's worthy interest is in mitigating the transmission of COVID-19. But California's limitations on in-home religious activities is noticeably more restrictive than analogous secular activities. The gatherings order limits Wong's and Busch's Bible study and home worship to three households, even when held outdoors.[1] Yet California permits the operation of many comparable secular activities without similar household limitations, despite implicating the same interest in preventing the spread of COVID-19.

In particular, hair salons, barbershops, and "personal care services" may open indoors without maximum household restrictions.[2] "Personal care services" include

---

[1] *CDPH Guidance for the Prevention of COVID-19 Transmission for Gatherings*, California Department of Public Health (Nov. 13, 2020), https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Guidance-for-the-Prevention-of-COVID-19-Transmission-for-Gatherings-November-2020.aspx.
[2] *See* California Department of Public Health, COVID-19 Industry Guidance: Hair Salons and Barbershops (Oct. 20, 2020),

8

many businesses where hours-long physical proximity and touching is required, such as nail salons, tattoo parlors, body waxing, facials and other skincare services, and massages.[3]  So too with barbershops and hair salons.  Discussions of faith and scripture, by comparison, can take place while socially distanced.

Some personal care services may even allow their clients to forego masking. Facials, electrolysis, and other like services necessarily require ready access to a client's face, and California permits clients in such circumstances to go maskless.[4] The result is that a beauty shop may host an *unrestricted* number of households, half of them bare-faced and in immediate proximity to the other half.  But Wong, in a space of the same size—even an outdoor space—would be limited to three households, despite donning masks and maintaining a six-foot distance.

Likewise, Busch, whose Bible study is attended by couples, can host only two other couples in her house or backyard, no matter how much distance they maintain or the size of her living room.  But tattoo artists may inject ink into the arms, legs,

---

https://files.covid19.ca.gov/pdf/guidance-hair-salons--en.pdf; California Department of Public Health, COVID-19 Industry Guidance: Expanded Personal Care Services (Oct. 20, 2020), https://files.covid19.ca.gov/pdf/guidance-expanded-personal-care-services--en.pdf.

[3] *See Industry guidance to reduce risk*, Covid.CA.gov, https://covid19.ca.gov/industry-guidance/#personal-care-services (updated Oct. 20, 2020).

[4] California Department of Public Health, COVID-19 Industry Guidance: Expanded Personal Care Services 11 (Oct. 20, 2020), https://files.covid19.ca.gov/pdf/guidance-expanded-personal-care-services--en.pdf.

9

and faces of clients with no household limitation—meaning, in a space the same size as Busch's living room, tattoo parlors may accommodate perhaps double or triple the number of households.

The disparity of treatment between secular and religious activities is even more pronounced when we consider the outdoor-gatherings rules. Under California's restrictions, except at places of worship,[5] outdoor gatherings for religious activities are subject to a three-household maximum. Nevertheless, outdoor gatherings for rallies and protests are subject to *no* household maximum, so long as attendees stay six feet away from others of different households.[6] Accordingly, if Wong and Busch move their Bible studies or prayer groups to their backyards, the three-household maximum would still be in effect. But if a political party or organization wants to hold a rally or protest *at the same or any other location*, then maximum household limits are off the table. Under the Constitution, what's good for political rallies and protests should also be good for religious

---

[5] Although California restricts indoor capacity at places of worship to 25% in Tiers 1 and 2 and to 50% in Tiers 3 and 4, it does not impose maximum household limits on outdoor activities. *See Industry guidance to reduce risk*, Covid.CA.gov, https://covid19.ca.gov/industry-guidance/ (under the "Places of worship and cultural ceremonies" tab) (updated Feb. 22, 2021).

[6] *About COVID-19 restrictions*, Covid19.CA.gov (Mar. 22, 2021), https://covid19.ca.gov/stay-home-except-for-essential-needs/ (under the "Can I engage in political rallies and protest gatherings?" tab).

worship. In other words, California cannot treat religious exercise worse than political expression.

A law is not generally applicable when its restrictions "substantially underinclude non-religiously motivated conduct that might endanger the same governmental interest that the law is designed to protect." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1079 (9th Cir. 2015) (citing *Lukumi*, 508 U.S. at 542–46). But California is guilty of doing just that. The State makes exemptions based on the *subject matter* of the gathering by lifting household caps for political expression but not for religious expression. If people want to gather to engage in an outdoor political rally or protest, California's message to them is, "Go right ahead!" But if those same people wish to gather outdoors to pray, unless at a place of worship, California says, "Not so fast!" Political rallies and protests are favored—even though the State admits that they "present special public health concerns for high risk of COVID-19 transmission."[7] Religious gatherings are not. This sort of religious gerrymander is odious to the First Amendment and to the Supreme Court's precedents. Consequently, California's restrictions have the same problem as in *Gateway City Church*: once again providing exceptions for certain favored activities but excluding religious activities. 2021 WL 308606, at *10.

---

[7] *About COVID-19 restrictions*, Covid19.CA.gov (Mar. 22, 2021), https://covid19.ca.gov/stay-home-except-for-essential-needs/ (under the "Can I engage in political rallies and protest gatherings?" tab).

11

These inconsistent regulations amount to disparate treatment of religious practice and are accordingly not generally applicable. *See Roman Catholic Diocese*, 141 S. Ct. at 66–67; *South Bay*, 141 S. Ct. at 717 (statement of Gorsuch, J.). California's COVID-19 restrictions patently favor analogous, secular activities over in-home worship and Bible studies. Thus, these restrictions are subject to the "most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546. I do not begrudge business owners their reprieve, but when California allows greater freedoms for some sectors, it may not leave religious activities behind. The Court's recent decisions "clearly dictate[]" the outcome here. *Gateway City Church,* 2021 WL 753575, at *1. Strict scrutiny applies.

### 2.

To satisfy strict scrutiny, California must show that the restriction is narrowly tailored to serve a compelling state interest. *Roman Catholic Diocese*, 141 S. Ct. at 67. Managing the COVID-19 pandemic is doubtless a compelling interest. *Id.* But California has not met its burden of demonstrating that the gatherings restriction is narrowly tailored.

Our strict scrutiny review is no less exacting because of our unusual times. Even in the face of a pandemic, "[i]t has never been enough for the State to insist on deference or demand that individual rights give way to collective interests." *South Bay*, 141 S. Ct. at 718 (statement of Gorsuch, J.). While "we are not scientists," we

do not "abandon the field when government officials with experts in tow seek to infringe a constitutionally protected liberty." *Id*.

California asserts the gatherings restriction is narrowly tailored because it is based on "objective risk criteria," and baldly claims that less-restrictive alternatives will not do. *See Tandon v. Newsom*, No. 20-cv-7108, 2021 WL 411375, at *18 (N.D. Cal. Feb. 5, 2021). The criteria are:

> (1) the ability to accommodate face covering wearing at all times; (2) the ability to physically distance between individuals of different households; (3) the ability to limit the number of people per square foot; (4) the ability to limit the duration of exposure; (5) the ability to limit the amount of mixing of people from different households; (6) the ability to limit the amount of physical interactions; (7) the ability to optimize ventilation; and (8) the ability to limit activities that are known to increase the possibility of viral spread, such as singing, shouting, and heavy breathing.

*Id*. But these criteria are nearly word for word the same ones rejected by the Supreme Court as insufficient to justify the shutdown of places of worship under strict scrutiny. *See South Bay III*, 985 F.3d at 1134 (listing criteria); *South Bay*, 141 S. Ct. at 718 (statement of Gorsuch, J.) (noting that these factors—while "legitimate concerns"—do not justify a total ban on places of worship).

The reasoning of *South Bay* applies with equal force to worship and prayer within the home. The above factors are not "always present in [in-home] worship," even with more than three households, and they are not "always absent from the other secular activities its regulations allow." 141 S. Ct. at 718. An in-home Bible

13

study including more than three households may be conducted with face coverings and physical distancing; for a limited duration; with no "mixing" of households, physical interactions, or singing or shouting; and with open windows and doors. The same can hardly be said of tattoo parlors and nail salons. This sort of mismatch is a "telltale sign[]" of the lack of narrow tailoring. *Id.* California's failure to even attempt to distinguish *South Bay* only underscores this inevitable conclusion.

Even if studying scripture at home risks some level of transmission of COVID-19, the exemptions for barbershops, tattoo and nail parlors, and other personal care businesses reveal that less-restrictive alternatives are available to California to mitigate that concern. If the State is truly concerned about the "proximity, length, and interaction" of private gatherings, as it claims, it could regulate those aspects of religious gatherings in a narrowly tailored way. But the one thing California cannot do is privilege tattoo parlors over Bible studies when loosening household limitations.[8]

---

[8] The majority falsely charges me with implying that tattoo parlors "significantly contribute" to the spread of COVID-19 in California. Maj. Op. 22 n.9. I make no such implication. Indeed, the majority cites to nothing in my dissent for this needless accusation. I draw the comparison between the two because tattoo parlors require close interactions, while Bible studies do not. That California treats them differently should be given the highest scrutiny.

14

Accordingly, the gatherings restriction fails strict scrutiny when applied to religious practices, and so Wong and Busch are likely to prevail on their Free Exercise claim.

## 3.

The majority concludes that Wong and Busch are unlikely to succeed on the merits because California bans in-home gatherings with more than three households across the board. The majority insists that we look to California's treatment of other in-home activities, and not to secular businesses, to determine if the Constitution was violated. It confines *Roman Catholic Diocese*, *South Bay*, and *Gateway City Church* to only places of worship. This is wrong for several reasons.

Neither the Constitution nor the Court's precedents limit the right to free exercise to places of worship. The text of the First Amendment confers protection on religious "exercise," not "places of worship." U.S. Const. amend. I. Thus, the freedom to practice one's religion inheres without respect to location. So whether at church, mosque, synagogue, or *at home*, the State may not infringe on the free exercise right—at least not without a compelling interest and narrow tailoring.

The majority draws a different rule, allowing States to disfavor religious exercise at home, as long as they ensure places of worship maintain equal footing with business interests. But there is no basis under the Free Exercise Clause or the Supreme Court's precedents to confine religious freedom to "free exercise zones,"

15

while worship elsewhere is left in the cold. The majority only gets there by narrowing *Roman Catholic Diocese*, *South Bay*, and *Gateway City Church*'s applicability to places of worship so that they have no binding or even persuasive value in any other context. But as lower court judges, we "don't have license to adopt a cramped reading of a case" or to "create razor-thin distinctions" to evade the reach of precedent. *Nat'l Lab. Rels. Bd. v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Loc. 229, AFL-CIO*, 974 F.3d 1106, 1117 (9th Cir. 2020) (Bumatay, J., dissenting). Rather, we often look to the "reasoning" of the Court's precedents for instruction, not just a simplistic comparison of facts. *Langere v. Verizon Wireless Servs. LLC*, 983 F.3d 1115, 1121–22 (9th Cir. 2020).

By limiting these precedents to houses of worship, the majority loses sight of *why* houses of worship are protected at all: because of the religious exercise that occurs therein. The Constitution shields churches, synagogues, and mosques not because of their magnificent architecture or superlative acoustics, but because they are a sanctuary for religious observers to practice their faith. And that religious practice is worthy of protection no matter where it happens. As singer Brandon Flowers puts it, "[t]his church of mine may not be recognized by steeple / But that doesn't mean that I will walk without a God." *Playing With Fire*, Flamingo (Island Records 2010). So while Wong and Busch's prayer groups and Bible studies do not

16

take place in a building topped with a steeple, the First Amendment is broad enough to shelter their worship.

The majority artificially creates narrow lines of comparison by refusing to consider California's treatment of secular businesses. This flies in the face of the Court's instructions, which analogized places of worship to a broad range of facilities, including schools, garages, and campgrounds. *Roman Catholic Diocese,* 141 S. Ct. at 66. Under California's stated interest in reducing the transmission of COVID-19, it's hard to see why in-home religious gatherings should be treated differently from personal care businesses. Indeed, it does not take a scientist or doctor to understand that hair salons, barbershops, and tattoo parlors can operate in spaces similar in size to a home; that they could host a similar number of households as a Bible study; or that they could service customers for as long as a prayer meeting. The majority does not refute any of this. Instead, it cites to the district court's findings regarding the relative risk of transmission between social gatherings in general and *grocery* and *retail* shopping. *See* Maj. Op. 19 (citing *Tandon*, 2021 WL 411375, at *30). None of this is dispositive for comparison to personal care businesses.

Given the similarities between these activities, we should not myopically focus only on California's treatment of in-home activities to determine whether the State unconstitutionally infringes on religious rights. As explained above, the

17

suppression of *some* comparable secular activity in a similar fashion as religious activity is not dispositive. *See Roman Catholic Diocese*, 141 S. Ct. at 73 (Kavanaugh, J., concurring). That California treats all in-home activities in an equally poor manner does not grant it a pass on strict scrutiny review.

The majority also emphasizes that nail parlors and other small businesses are not analogous to in-home worship because, though exempt from maximum household limitations, they must disinfect surfaces and take other protective measures. Maj. Op. 20–22. This only proves my point: there is no apparent reason why California cannot provide health and safety guidance for in-home worship as it does for businesses.[9] That California believes these measures allow businesses— even those requiring physical proximity and unmasking, like facial providers—to open without a three-household limitation is a sure sign that narrower tailoring is possible for in-home religious practice. While such measures may be intrusive, preventing Wong and Busch from practicing their religion as they see fit is even more intrusive.[10]

---

[9] The majority also makes the most circular of arguments here: that personal care businesses are not proper comparators to in-home religious worship precisely because California imposed different COVID-19 restrictions on the two. Maj. Op. 22. But this roundabout reasoning permits the State to shield itself from strict scrutiny by imposing a regulatory disparity, which instead should trigger strict scrutiny. Courts then become nothing more than rubberstamps for State regulation.

[10] The majority reasons that the Fourth Amendment's core protection of the home somehow supports the banning of religious exercises at that same home. Maj. Op. 22. I disagree with that understanding of the Fourth Amendment.

Finally, the majority appears to share my concerns regarding California's exemption for political rallies and protests but not for religious activity. The majority prefers not to reach that issue because Wong and Busch have not made the precise argument here. Maj. Op. 26. But, as Justice Thurgood Marshall once wrote, "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). In addition to the other indicia of disparate treatment, the political rallies and protests exemption demonstrates a clear disfavoring of religious activity. Accordingly, we should have held that Appellants are likely to succeed on the merits.[11]

**B.**

The irreparable harm factor also cuts strongly in favor of granting the injunction. California's gatherings restriction unquestionably causes "irreparable harm." *Winter*, 555 U.S. at 20. As enforced, the household limitation bars Wong and Busch from hosting in-home Bible studies or communal prayers with their group of fellow worshipers. But even during a pandemic, the "loss of First Amendment

---

[11] Under our recent precedents, a motions panel's decision is not binding on a later merits panel in the same case. *See, e.g.*, *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 753 (9th Cir. 2020). While I question the wisdom of this precedent, the merits panel in this case is free to revisit the majority's erroneous view of the law.

freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese*, 141 S. Ct. at 67 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).

Here, the loss has been far greater than just a day. Although both Wong and Busch regularly held these religious gatherings in the years leading up to the pandemic, California has barred them from meeting as a group for nearly a year. And absent injunctive relief, their religious practices will continue to be interrupted for the foreseeable future.

## C.

The public interest also favors an injunction. Protecting religious liberty is "obviously" in the public interest. *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018). Indeed, the "Constitution and laws have made the protection of religious liberty fundamental." *Apache Stronghold v. United States*, No. 21-15295, 2021 U.S. App. LEXIS 6562, at *20 (9th Cir. Mar. 5, 2021) (Bumatay, J., dissenting). Here, Wong and Busch request a very narrow injunction, seeking only to prevent California from prohibiting them from hosting religious gatherings at their homes with more than three households during the pendency of this appeal. They have not requested a State-wide injunction of the gatherings rule. Such a targeted injunction is eminently justified compared to the "profound interest in men and women of faith

20

worshiping together." *On Fire Christian Ctr., Inc. v. Fischer*, 453 F. Supp. 3d 901, 914 (W.D. Ky. 2020).

California asserts, and I agree, that "the public has a powerful interest in curbing COVID-19 to prevent illness and death as well as preventing the State's hospital system from being overwhelmed." Opp'n 29. Nevertheless, there is no indication that "public health would be imperiled if less restrictive measures were imposed." *Roman Catholic Diocese*, 141 S. Ct. at 68. Nothing in the record supports the view that Wong's and Busch's in-home worship is more dangerous for the spread of COVID-19 than the operation of other businesses open for customers without household caps.

At bottom, the public interest is not "served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020). Instead, California has amply demonstrated that such alternatives are available given that hair salons, tattoo parlors, and piercing shops are all operating without strict household limitations.

### III.

The purpose of the Constitution was to place certain freedoms beyond the whims of the government. Even in times of crisis, we do not shrink from our duty to safeguard those rights. Freedom of worship is one of those enshrined rights, and

21

the Supreme Court's instructions have been clear, repeated, and insistent: no COVID-19 restriction can disfavor religious practice. Yet our court today trudges out another denial of relief to those seeking to practice their faith in the face of discriminatory restrictions. I respectfully dissent.